**K&L Gates LLP**
10100 Santa Monica Blvd., 8th Floor
Los Angeles, CA 90067
Tel: 310-552-5000
Fax: 310-552-5001
Christina N. Goodrich (SBN 261722)
christina.goodrich@klgates.com
Zachary T. Timm (SBN 316564)
Zach.Timm@klgates.com
Trevor J. Wynn (SBN 327623)
trevor.wynn@klgates.com

*Attorneys for Plaintiff AXOS BANK*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| AXOS BANK, a federally chartered savings bank,<br><br>                    Plaintiff,<br><br>v.<br><br>NANO BANC, a California corporation; ROBERT HASLER, an individual; MARK TRONCALE, an individual; SHELBY POND, an individual; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | Case No.: 5:19-cv-02092-JGB-SHK<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>**(1)    MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1836);**<br>**(2)    INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;**<br>**(3)    INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**<br>**(4)    NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**<br>**(5)    BREACH OF CONTRACT (AS TO HASLER);**<br>**(6)    VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (Cal. Civ. Code §§ 17200, *et seq.*); and**<br>**(7)    BREACH OF CONTRACT (AS TO POND).**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Axos Bank, a federally chartered savings bank, formerly known as BofI Federal Bank ("Plaintiff" or "AXOS"), complains and alleges as follows:

## STATEMENT OF THE ACTION

1.       AXOS brings this Second Amended Complaint as a result of the wrongful acts of misappropriation of trade secrets, intentional interference with contractual relations, intentional and negligent interference with prospective economic advantage, and unfair competition committed by Nano Banc ("Nano Banc"), a California-chartered bank that competes with AXOS, one of Nano Banc's founders, Mark Troncale ("Troncale"), and AXOS's former employees Robert Hasler ("Hasler") and Shelby Pond ("Pond"), who were involved in the formation of Nano, including while they both still worked for AXOS, as well as Hasler's and Pond's breaches of contractual obligations and fiduciary duties owed to AXOS.  Nano Banc and Troncale are sometimes collectively referred to herein as "Nano," and with Hasler and Pond are collectively referred to herein as "Defendants."  This Second Amended Complaint has become necessary because documents only recently produced by Defendants have demonstrated Troncale's and Pond's individual liability in the acts and conspiracy previously alleged in AXOS's initial Complaint and First Amended Complaint, as well as demonstrating Pond's breached of contractual duties owed to AXOS, which were previously unknown to AXOS.

2.       From approximately September 5, 2012 to July 2, 2018, Hasler was employed by AXOS in California.[1]

3.       While at AXOS, Hasler held the position of Vice President, Director of Business Development in AXOS's Specialty Deposits Division.  Hasler's duties included developing sales and marketing strategies and partnerships for AXOS to generate deposits from 1031 exchange companies, homeowners' associations, and other specialty deposit market segments, a valuable source of deposits for the bank.

---

[1] During Hasler's employment, AXOS was still known as BofI Federal Bank.

4.      As a leader of the Specialty Deposits Division, Hasler had access to, and did access, AXOS's confidential and proprietary information (including AXOS's Trade Secrets as defined herein).

5.      From approximately July 12, 2012 to November 9, 2012, and then again from approximately December 1, 2014 to March 28, 2018, Pond was also employed by AXOS in California.

6.      While at AXOS, Pond held the titles of Direct Banker, Inbound Direct Banker, and eventually Business Development and Relationship Manager in the Business Banking Department, working directly with the Specialty Deposits Division and working.

7.      Through her position with AXOS, Pond also had access to, and did access, AXOS's confidential and proprietary information (including AXOS's Trade Secrets as defined herein).

8.      In the beginning of 2017, Troncale contacted Hasler regarding an opportunity to join and take part in the formation of a bank he (and others) intended to form.  Shortly thereafter, Hasler began coordinating with Troncale and Nano Banc to assist in Nano Banc's formation.  This included soliciting investors to invest in Nano Banc, conducting meetings with Nano Banc, and taking part in the business development plan of Nano Banc, including in relation to onboarding new clients, all while Hasler was working for AXOS and owed AXOS contractual and fiduciary obligations.

9.      Upon information and belief, Hasler informed Pond of the same by March 2017, and thereafter Pond became involved in Nano Banc's formation as well.  This was also while Pond was still working for AXOS and similarly owed AXOS contractual and fiduciary obligations.

10.      In the fall of 2017, Nano Financial Holdings, Inc. ("Nano Financial"), the current holding company for Nano Banc, announced its intent to acquire an entity with an existing bank charter.

11.     On January 3, 2018, Nano Financial announced its plans to acquire Murrieta-based Commerce Bank of Temecula Valley for $23.3 million.

12.     Through its investigation, AXOS has uncovered information that during this time, Nano Financial had contact with Hasler, and in so doing, conspired with Nano Banc to take AXOS's employees and Trade Secrets to allow Nano Banc to trade off of AXOS's years of hard work and investment.

13.     As discussed further below, upon information and belief, the principals at what would become Nano Banc engaged in a scheme to profit from wrongfully trading off of other banks' years of hard work and investment in developing client relationships and banking groups.  These banks include AXOS and Citizens Business Bank ("CBB").  CBB filed a related action against Nano Banc in this Division entitled *Citizens Business Bank v. Nano Banc*, Case No. 5:18-CV-02418-JGB-SHK, and a related arbitration against a former employee (collectively, "CBB Actions") to remedy the harm it has suffered due to Nano Banc's wrongful scheme.  The CBB Actions have since resolved in a private and confidential settlement.

14.     As part of this scheme, upon information and belief, the principals at what would become Nano Banc actively searched for and solicited key employees with access to and knowledge of valuable, confidential, and proprietary information (including trade secrets) to fill certain key roles at the new bank who would help to quickly develop successful banking groups, which had taken Nano Banc's competitors (like AXOS and CBB) years to develop.

15.     They did not need to search far—they targeted employees at AXOS. These employees included Hasler and Pond.  Among other things, Hasler and Pond had access to and knowledge of AXOS's highly valuable, confidential, and proprietary information (including AXOS's Trade Secrets, as defined below). These employees also included Michael Fortney ("Fortney"), who also had valuable information from AXOS that would be valuable to Nano Banc in

-4-

competing with AXOS. Fortney (and Pond) worked almost exclusively on Hasler's accounts while at AXOS.

16.     Upon information and belief, Hasler and Pond knowingly and willingly engaged in conduct as described herein to assist Nano's scheme, including providing Nano with AXOS's highly valuable, confidential, and proprietary information (including AXOS's Trade Secrets, as defined below), even though he knew that it breached their contractual obligations and duties to AXOS.

17.     Indeed, upon information and belief, by targeting Hasler, Pond, and other AXOS employees, Nano Banc sought to trade off of AXOS's years of hard work and investments in building its Specialty Deposits Division so that it could build its own such group, with little effort and in a short amount of time, to compete with AXOS's Specialty Deposits Division and reap the valuable benefits therefrom.

18.     Upon information and belief, Nano Banc solicited Hasler and Pond for hire and to disclose AXOS's confidential and proprietary information (including AXOS's Trade Secrets, as defined below), while Hasler was still employed by AXOS.

19.     In the months leading up to Hasler's resignation, Fortney also resigned from AXOS to join Nano Banc. Additionally, Pond was terminated by AXOS. At the time of her termination, Pond was already being recruited by Nano Banc and was already planning to leave to join Nano Banc, which she did, and where she would soon be joined by Hasler (and Fortney). During that same time, Hasler all but ceased bringing in any new business to AXOS, and was already diverting new business to his soon-to-be new employer, Nano Banc.

20.     In fact, upon information and belief, AXOS's clients were informed by Hasler that he (and Fortney) were leaving AXOS even before either resigned from AXOS, and were soliciting such clients to move their funds from AXOS to Nano Banc (or to open accounts with Nano Banc instead of AXOS). Further,

when Fortney did resign from AXOS, Hasler feigned a self-serving ignorance and concern relating to such resignation, despite, upon information and belief, having previously informed numerous of AXOS's clients about Fortney's impending resignation from AXOS to join Nano.

21.     In addition, upon information and belief, while Hasler was still employed at AXOS, AXOS's clients that Hasler was servicing started to move their business from AXOS to Nano Banc, where they were already being served by Fortney and Pond.  Hasler took part in these solicitations, including through emails sent to AXOS's clients while Hasler was still employed by AXOS that encouraged clients to move accounts to Nano Banc, stating, "Ideally and hopefully you could put all or a good portion of the funds that are at BOFI with Nano, but whatever you want to do would be greatly appreciated."

22.     By July 2018, Nano Banc had succeeded in its scheme to solicit Hasler and other AXOS employees and acquire AXOS's confidential and proprietary information (including AXOS's Trade Secrets, as defined below), when Hasler resigned from AXOS and joined Nano Banc.

23.     While working at AXOS, Hasler, Fortney, and Pond executed agreements that required them to protect AXOS's confidential and proprietary information (including AXOS's Trade Secrets, as defined below) even after they resigned from AXOS.  Upon information and belief, Defendants interfered with these contractual obligations by encouraging and conspiring with one another, as well as Fortney and Pond to, *inter alia*, misappropriate AXOS's confidential and proprietary information (including AXOS's Trade Secrets, as defined below) in order to unfairly compete with AXOS in violation of their contractual obligations and the law.

24.     Upon information and belief, Defendants also acquired and used AXOS's confidential and proprietary information (including the AXOS Trade

Secrets, as defined below) to solicit numerous of AXOS's clients, including its Specialty Deposits Division clients, without AXOS's authority or consent.

25.     Upon information and belief, Defendants' wrongful conduct, including its use of AXOS's confidential and proprietary information (including AXOS's Trade Secrets, as defined below) in violation of the law and of Hasler's, Fortney's, and Pond's contractual obligations to AXOS, and without AXOS's authorization or consent, has resulted in concrete economic harm to AXOS and benefit to Nano Banc.

26.     For their part, and as discussed in further detail below, Hasler and Pond understood the value of their access to and knowledge of AXOS's confidential and proprietary information (including AXOS's Trade Secrets as defined below).  Upon information and belief, Hasler and Pond had an incentive to steal such information and wrongfully solicit AXOS's employees and clients because their total compensation from Nano Banc, including bonuses, was specifically tied to deposits that he brings to Nano Banc, including through AXOS's clients who they wrongfully solicited.

27.     Consequently, upon information and belief, Hasler and Pond sought to take advantage of their crucial access to AXOS's confidential and proprietary information (including AXOS's Trade Secrets as defined below) by, *inter alia*, disclosing such information to Nano Banc and using it to wrongfully solicit AXOS's employees and clients.

28.     Indeed, AXOS has suffered damage as a result of Defendants' conduct, including loss of revenue, deposits, clients, and employees, including those relating to the Specialty Deposits Division that, among other things, services 1031 exchange companies and homeowners' associations, which are a valuable source of deposits for the bank.

29.     Relatedly, upon information and belief, Defendants have been wrongfully and unjustly enriched by their conduct alleged herein.  For example,

Nano Banc has been able to better compete with other banks, including AXOS, but has not had to undertake the same substantial investment that AXOS had to undertake to develop business, including the valuable business done by the Specialty Deposits Division such as with 1031 exchange companies and homeowners' associations.  Thus, Nano Banc is not only stealing AXOS's valuable confidential and proprietary information (including AXOS's Trade Secrets, as defined below), it is reaping concrete economic benefits at little to no cost, in comparison to its competitors, like AXOS.  Upon information and belief, this has led to a direct increase in Hasler's and Pond's compensation from Nano Banc.

30.     Upon information and belief, Nano Banc has been on notice of AXOS's allegations of wrongdoing and provisions of contracts between AXOS and its employees (including Hasler and Pond) that protect its confidential and proprietary information (including AXOS's Trade Secrets as defined below) through (at a minimum) allegations asserted in a currently-pending arbitration between Hasler and AXOS in which Nano Banc's counsel in the CBB Actions represents Hasler.  Despite such notice, Nano Banc's conduct has continued.  Further, upon information and belief, Nano Banc also required Hasler to disclose such contracts prior to his employment.

31.     By way of this Complaint, AXOS seeks to stop Defendants' knowing, willful, and wrongful conduct and seeks remedies, including damages and injunctive relief, to address and prevent further harm caused by Nano Banc.

## THE PARTIES

32.     AXOS is and, at all times mentioned herein, was a federally chartered savings bank with its principal place of business located at 4350 La Jolla Village Drive, San Diego, California 92122.

33.     Upon information and belief, Defendant Nano Banc is a California banking corporation with its principal place of business at 7755 Irvine Center Drive, Suite 300, 3rd Floor, Irvine, California 92618.  Nano Banc's registered

agent for service of process is Robert E. Sjogern at 7755 Irvine Center Dr., Third Floor, Irvine, California 92618.

34.    Upon information and belief, Defendant Mark Troncale is an individual who at all relevant times herein has worked and resided in Orange County, California.

35.    Upon information and belief, Defendant Robert Hasler is an individual who at all relevant times herein has worked and resided in Orange County, California.

36.    Upon information and belief, Defendant Shelby Pond is an individual who at all relevant times herein has worked and resided in Orange County, California.

37.    AXOS is unaware of the true names and capacities of the remaining defendants, sued as Does 1 through 10, and therefore sues defendants by such fictitious names.  AXOS will amend this Complaint to allege true names and capacities when ascertained.  Upon information and belief, each of the fictitiously named defendants are in some manner responsible for the harm AXOS has suffered and will suffer if injunctive relief is not allowed and/or damages are not awarded.

38.    Defendants, along with the other former AXOS employees discussed herein were, and now are, the agents, employees, and/or representatives of each other and, in doing the things hereinafter mentioned, were acting within the scope of their authority as such agents, employees, and/or representatives with the permission and consent of Defendants.

39.    Defendants were also each acting in conspiracy with one another to, *inter alia*, misappropriate AXOS's Trade Secrets, interfere with AXOS's contractual and prospective economic relations, and otherwise unfairly compete with AXOS.  As such, each Defendant is responsible for the acts of the other Defendants, and the damage AXOS has suffered as a result thereof.

**JURISDICTION AND VENUE**

40.     This action raises federal questions under the Defend Trade Secrets Act, 18 U.S.C. § 1836 and, thus, this Court has original jurisdiction under 28 U.S.C. § 1331.

41.     This Court has supplemental jurisdiction over the related state law claims asserted in this action pursuant to 28 U.S.C. § 1367 because they are so related to the federal claims providing this Court original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Indeed, the state law claims arise from the same set of operative facts common to the federal claim and the resolution of those claims serves the interests of judicial economy.

42.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(1) as all defendants reside in California, and Nano Banc's principal place of business is located in this District.  Venue is additionally proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims occurred in this District by reason of Defendants' conduct as alleged below.

43.     While Hasler signed an Arbitration Agreement with AXOS, which provides that disputes such as those alleged against Hasler in this First Amended Complaint will be subject to arbitration, AXOS and Hasler have agreed to waive the Arbitration Agreement for the limited purpose of resolving the claims asserted against Hasler in this Action and agreed to dismiss those same claims from the arbitration currently pending between Axos and Hasler now that the Court has entered the Order on the Parties' stipulation in this Action allowing AXOS to amend its Complaint to add Hasler as a defendant and to add related claims against Hasler in this Action, and continuing the discovery and trial-related deadlines. (*See* Docket Entry 42.)

44.     Defendants are subject to personal jurisdiction in this Judicial District.

45.     General personal jurisdiction exists over Nano Banc because it is a California corporation with its principal place of business in California.

46.     General personal jurisdiction exists over Hasler because he is, and at all times relevant was, a California resident.

47.     Specific personal jurisdiction also exists over Defendants because the specific facts that give rise to the conduct alleged in this First Amended Complaint took place in this Judicial District, as discussed below.  In particular, Defendants' misappropriation of AXOS's Trade Secrets, as defined below, and other wrongful conduct, took place in this Judicial District.

### CBB RELATED ACTION

48.     On November 14, 2018, CBB filed a lawsuit against Nano Banc in the United States District Court for the Central District of California, Eastern Division, Case No. 5:18-CV-02418-JGB-SHK ("CBB Related Action").

49.     In the Complaint filed in the CBB Related Action, CBB alleges similar allegations as those alleged herein, including that Nano Banc engaged in a scheme to wrongfully solicit its employees, steal its confidential, proprietary, and trade secret information, and engage in unfair competition.

50.     The claims in the CBB Related Action are the same as those asserted in this action and are based on Nano Banc's scheme to engage in wrongful conduct as set forth herein.

51.     On June 7, 2021, the parties in the CBB Related Action filed a Joint Stipulation to Dismiss the Case Pursuant to a Private Settlement.  On June 8, 2021, the Court entered an Order granting such Joint Stipulation.

### FACTUAL BACKGROUND

**AXOS and Its Specialty Deposits Division**

52.     AXOS is a federally chartered savings bank headquartered in San Diego, California with several groups, including a Specialty Deposits Division (now consolidated within AXOS's Commercial Banking Department) that, among

other things, services 1031 exchange companies and homeowners' associations, which are a valuable source of deposits for the bank.

53.     AXOS's Specialty Deposits Division is also a source of reliable income from account-related and transactional fees, given that these businesses generally have repeat business and large deposits.

54.     California's 1031 exchange businesses and homeowners' associations are highly specialized. AXOS's Specialty Deposits Division has spent years investing substantial resources developing the expertise needed to service these businesses, including acquiring specific knowledge of their practices, pricing strategies, key personnel, and decision-makers.

55.     Due to AXOS's investment and diligence over many years, the Specialty Deposits Division has become a leader in servicing 1031 exchange businesses and homeowners' associations, among others.

56.     Given AXOS's substantial investment of resources and time into developing the Specialty Deposits Division's experience and success in this area and that the division is an important source of deposits and income from account-related and transactional fees that are tied to the bank's profitability, the Specialty Deposits Division's business (along with the related AXOS's Trade Secrets, as defined below, and AXOS's Confidential Information) is extremely valuable to AXOS.

57.     AXOS's Confidential Information includes its Confidential Information as defined within the Pay Plan (as defined below) and set forth in Paragraph 67 below, as well as its confidential information as defined within the Non-Disclosure Agreement (as defined below).

**AXOS's Trade Secrets**

58.     AXOS has devoted substantial resources to acquire and maintain its valuable and protectable confidential and proprietary information (including

AXOS's Trade Secrets, as defined below), including information related to its Specialty Deposits Division and the valuable businesses it serves.

59.     AXOS's Trade Secrets includes, *inter alia*, its computer code and programs, product design definitions and specifications, product development agreements, term sheets and other related agreements, financial projections, marketing plans and marketing data and methodologies, sales data, unpublished promotional material, cost and pricing information, customer information (lists and preferences), pending patent applications, business know-how, processes (including process diagrams and flow charts), distribution sources, personnel information including but not limited to pay plans and bonus structures, commercial books of business, marketing materials, strategic financial information, forecasts, strategic business and financial plans, and client lists with specialized information regarding current, former, and prospective clients uncovered through the work of employees of AXOS (such as custom pricing, fee waivers, information about key decision makers, information about important service providers, client preferences, client's personal information, and know-how) (collectively, "AXOS's Trade Secrets").

**Protection of AXOS's Confidential, Proprietary, and Trade Secret Information**

60.     AXOS takes the protection of its confidential and proprietary information (including AXOS's Trade Secrets) very seriously precisely because it is so valuable.

61.     AXOS has taken diligent and reasonable steps to protect its confidential and proprietary information (including AXOS's Trade Secrets) from disclosure or use by third parties.

62.     AXOS protects its confidential and proprietary information (including AXOS's Trade Secrets) through measures that include, *inter alia*, limitations on the dissemination of information to third parties and on a need-to-know basis,

requiring consultation with AXOS's Office of the Chief Legal Officer when contemplating the disclosure of AXOS's sensitive information, the use of non-solicitation and confidentiality agreements, hierarchical protection of sensitive information, and password-protected access to its electronic information.

**AXOS's Relationship with Hasler and Pond, and Their Access to AXOS's Confidential, Proprietary, and Trade Secret Information**

63.     From approximately September 5, 2012, to July 2, 2018, Hasler was employed by AXOS in California. Specifically, Hasler was employed by BofI Federal Bank, which after Hasler's resignation from employment to join Nano Banc, changed its name to "Axos Bank" (i.e., AXOS as defined herein) in October 2018.

64.     While at AXOS, Hasler held the position of Vice President, Director of Business Development in the Specialty Deposits Division. Some of Hasler's duties included developing sales and marketing strategy and partnerships to generate deposits from homeowners' associations, 1031 exchange, and other specialty deposit market segments.

65.     As a leader of the Specialty Deposits Division, Hasler had access to, and did access, AXOS's confidential and propriety information (including AXOS's Trade Secrets).

66.     From approximately July 12, 2012 to November 9, 2012, and then again from approximately December 1, 2014 to March 28, 2018, Pond was also employed by AXOS in California.

67.     While at AXOS, Pond held the titles of Direct Banker, Inbound Direct Banker, and eventually Business Development and Relationship Manager in the Business Banking Department, working directly with the Specialty Deposits Division and working.

///

///

68.     Through her position with AXOS, Pond also had access to, and did access, AXOS's confidential and proprietary information (including AXOS's Trade Secrets as defined herein).

69.     As discussed below, Hasler, Fortney, and Pond repeatedly acknowledged and reaffirmed their obligations to protect AXOS's confidential and proprietary information (including AXOS's Trade Secrets) during and after their employment with AXOS.

**AXOS's Non-Solicitation and Confidentiality Agreement**

70.     As a condition of his employment with AXOS, Hasler and Pond were required to sign an Employee Confidentiality, Non-Disclosure, and Non-Recruiting Agreement (hereinafter referred to as the "Non-Disclosure Agreement"). Hasler executed the Non-Disclosure Agreement on or about April 1, 2013.  Pond executed the Non-Disclosure Agreement, including on or about December 1, 2014 when she rejoined AXOS December 1, 2014.  A true and correct copy of Hasler and Pond's Non-Disclosure Agreements are attached hereto as **Exhibit 1**.

71.     The Non-Disclosure Agreement prohibits the unauthorized disclosure and use of AXOS's Trade Secrets.  The Non-Disclosure Agreement requires that AXOS employees not use, publish, or disclose any of AXOS's Trade Secrets and confidential information—as that term is defined within the Non-Disclosure Agreement—during or after termination of their employment except as required in the conduct of AXOS's business or as authorized in writing by AXOS.  After termination of employment, the Non-Disclosure Agreement requires employees to inform AXOS, and to deliver to AXOS, all Trade Secrets and confidential information which they prepared, used, or came in contact with while employed at AXOS.

72.     Pursuant to Paragraph 2D of the Non-Disclosure Agreement, Hasler and Pond acknowledged that Trade Secrets and confidential information

developed, created, or maintained by him, alone or with others, while employed by AXOS, shall remain at all times the sole property of AXOS.

73.     Pursuant to Paragraph 2F of the Non-Disclosure Agreement, Hasler and Pond agreed they would not use AXOS's Trade Secrets and confidential information to solicit, or attempt to solicit, any business from any of AXOS's clients and/or customers for the purpose of providing products or services that are competitive with those provided by AXOS for a period of two years following the termination of their employment with AXOS.

74.     Pursuant to Paragraph 8 of the Non-Disclosure Agreement, Hasler and Pond agreed that if AXOS's Trade Secrets and confidential information was disclosed to a competing business or used in a manner not authorized in the Non-Disclosure Agreement, such unauthorized disclosure or use would cause immediate and irreparable harm to AXOS, and would give the competing business an unfair business advantage against AXOS for which AXOS may not have an adequate remedy at law.  Accordingly, Hasler agreed that AXOS would be entitled to any proper injunction to enforce certain provisions of the Non-Disclosure Agreement.

75.     AXOS never relieved Hasler or Pond of any obligations set forth in the Non-Disclosure Agreement.

76.     During his employment, Fortney also executed a non-disclosure agreement identical in all material respects to the one executed by Hasler.

**AXOS's Pay Plan and Confidentiality Agreement**

77.     Additionally, as a condition of his employment with AXOS, Hasler was required to sign a BofI Federal Bank – Pay Plan Commissioned Employee Compensation Plan (hereinafter referred to as the "Pay Plan".)  Hasler executed the Pay Plan on or about July 27, 2017.  Because AXOS treats the Pay Plan as confidential, it is not attached hereto, but the relevant provisions at issue are discussed, cited, and quoted verbatim below.

78.     The Pay Plan explicitly placed a duty of loyalty on Hasler. Specifically, Section II.D. of the Pay Plan is labeled "**Duty of Loyalty**" and states as follows:

> "Employee agrees that, during the term of Employee's employment with the Company, Employee shall: (a) devote Employee's full business time, attention, best efforts, skill and ability exclusively to the business of the Company; (b) do Employee's utmost to further the interests of the Company and not take any action intended or reasonably expected, in each case, to harm the Company; and (c) not, directly or indirectly, engage, participate, make any financial investment in, or become employed by or render advisory or other services to or for any person, firm, corporation or other business enterprise that is, or is reasonably likely to become engaged, directly or indirectly, in competition with the Company.  Employee expressly agrees that this section is fair and reasonable and that Employee is being adequately compensated for agreeing to the terms of this section."

79.     Furthermore, the Pay Plan specifically includes a confidentiality provision.  Specifically, Section V. of the Pay Plan is labeled "**CONFIDENTIALITY**" and states as follows:

> "In exchange for Employee's receipt and access to Confidential Information, as defined herein, and in consideration of employment or continued employment of Employee and compensation paid to Employee pursuant to this Pay Plan, which Employee agrees and acknowledges is good and valuable consideration for the promises made herein, Employee agrees as follows:

A. __General__. Employee hereby acknowledges that Employer has developed and owns valuable trade secrets and other confidential and proprietary information related to its businesses, including but not limited to concepts, ideas, customer lists (including customers who have prospective transactions/Commissionable Activities with the Employee while the Employee is employed with Employer), business lists, information regarding customers and the product mix of customers developed by Employer, manuals, market data and projections, operating policies and procedures, loan and program product specifications and documents, and plans, both oral and written, as well as financial information, accounting procedures, financial management procedures and information relating to its customers, officers, directors, employees and agents (collectively, **"Confidential Information").**     A "Trade Secret" is any Confidential Information that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain such information's secrecy.

Employee shall not, at any time during or after Employee's employment with Employer, in any manner, either directly or indirectly, use, divulge, disclose or communicate Employer's Trade Secrets to any person, firm, corporation or other entity, or use Confidential Information for Employee's own benefit or the benefit of any person, firm, corporation or other entity, and not for the benefit of Employer, without the express prior written consent of an

authorized executive officer of Employer.  An authorized officer shall be an officer of the Company with the title of Executive Vice President or higher who has indicated that such authorized officer has consulted with the Company's legal department before authorizing such action. Employee shall not disclose any Confidential Information except as provided by the Company's policies or as required by applicable law. Failure to abide by the obligations provided in this section regarding Confidential Information and Trade Secrets will result in disciplinary action being taken against the Emp1oyee, and the Company may pursue all legal remedies available to protect the Company's Trade Secrets and Confidential Information, including pursuing legal action against the Employee after termination.

Upon termination of Employee's employment with Employer, Employee shall surrender any and all Confidential Information to Employer that, in each case, is in Employee's possession or to which Employee has direct or indirect access."

80.     Finally, the Pay Plan states that it is governed by California Law. Specifically, Section VI.D. of the Pay Plan is labeled "**Governing Law**" and states as follows:

D. **Governing Law.** This Pay Plan shall be governed by, construed and enforced in accordance with the laws internal to the State of California, except to the extent preempted by federal laws of the United States.

81.     Moreover, as a condition of his employment with AXOS, Hasler was required to sign a Confidentiality Agreement, effective September 5, 2012, between himself and AXOS.  A true and correct copy of the Confidentiality Agreement is attached hereto as **Exhibit 2**.  The Confidentiality Agreement, along with the, Non-Disclosure Agreement and Pay Plan are sometimes collectively referred to herein as the "Axos/Hasler Agreements."  Pursuant to Paragraph II of the Confidentiality Agreement, Hasler acknowledged his understanding that AXOS had invested significant time, effort and expense in developing its Confidential Information, that it is a valuable asset to AXOS, and that Hasler agreed not to disclose the Confidential Information, as that term is defined within the Confidentiality Agreement, without prior consent from AXOS.  Pursuant to Paragraph I, Confidential Information includes, *inter alia*, customer lists and records and trade secrets.

82.     AXOS never relieved Hasler of any obligations set forth in the Axos/Hasler Agreements.

83.     Pond executed a pay plan and confidentiality agreement that had provisions identical to those in the Pay Plan and Confidentiality Agreement executed by Hasler with respect to information relevant to the issues raised in this Second Amended Complaint (such as confidentiality and other such provisions). The confidentiality agreement and pay plan, along with the Non-Disclosure Agreement executed by Pond are sometimes collectively referred to herein as the "Axos/Pond Agreements."

84.     As discussed below, upon information and belief, Nano Banc encouraged Hasler and Pond to, and they in fact did, violate their contractual and other obligations to AXOS in connection with Defendants' wrongful scheme and plan to unfairly compete with AXOS.

///

///

**The Birth of Nano Banc and its Efforts, in Coordination With Hasler and Pond, to Trade off of AXOS's Years of Hard Work**

85.      In September 2017, Nano Financial announced that it was raising capital to buy an entity with an existing bank charter so that it could build a new bank, which would eventually come to be known as Nano Banc.

86.      In connection therewith, and prior to this announcement, upon information and belief principals at Nano Financial (and what would become Nano Banc) (including Troncale) began searching for and soliciting key individuals who had access to valuable confidential and proprietary information (including trade secrets) to fill certain important roles that would help grow Nano Banc's business, including with respect to the valuable services provided to 1031 exchange companies and homeowners' associations, which are a valuable source of deposits and profitability for a bank.

87.      The principals at what would become Nano Banc (including Troncale) were sophisticated and skilled managers and supervisors who were experienced in financial services, had served "as trusted advisors and business consultants for decades," had competed in the industry, and understood the value of a competitor's (AXOS's) confidential and proprietary information (including AXOS's Trade Secrets), as well as its Specialty Deposits Division, which AXOS had spent years developing through substantial investments of money, time, and effort, and had paid Hasler at a high level in connection therewith.

88.      Two of Nano Banc's principals—Troncale and Mark Rebal ("Rebal")—were intimately familiar with the keys to banking profitability and success because they had co-founded and sold California Republic Bank.

89.      Upon information and belief, consistent with the common practice in the industry, Troncale and Rebal were likely subject to non-competition agreements in connection with their sale of California Republic Bank.  Upon

information and belief, Troncale and Rebal co-founded Nano Banc on the heels of the expiration of their obligations under such non-competition agreements.

90.     According to Nano Banc's website at the time AXOS filed its initial Complaint in this action, Troncale is a co-founder of Nano Banc and its President. He is experienced in financial services and leads the treasury and cash management department that competes with AXOS's Specialty Deposits Division. According to Nano Banc's website, Troncale "has been influential in building the back office to adapt to the deposit growth."  Troncale was a Senior Vice President at California Republic Bank, leading the cash management and treasury department.

91.     According to Nano Banc's website at the time AXOS filed its initial Complaint in this action, Rebal is also a co-founder of Nano Banc and its Chief Executive Officer.  According to Nano Banc's website at the time AXOS filed its initial Complaint in this action, Rebal is "a thirty-four year banking professional," "co-founder of California Republic Bank (stock ticker 'CRPB') in 2007" and "Chief Credit Officer of CRPB."  "Rebal has been involved in many aspects of commercial banking and indirect auto financing including: Risk Management, Special Assets, Relationship Management, Credit Administrator, Commercial Real Estate Appraisal, and CRA Officer with two very successful exams by the FDIC and FRB."  Rebal "is on the Board of Directors of the Clearinghouse CDFI, and he sits on their Asset Committee and he Chairs their Commercial Real Estate Investment Committee."

92.     Upon information and belief, given their experience with California Republic Bank and in the industry, Troncale and Rebal (and Nano Banc's other principals) understood that Nano Banc would need a substantial and reliable source of deposits, such as the large deposits in the accounts that Hasler managed at AXOS (with assistance from Pond and Fortney), including those provided by AXOS's Specialty Deposits Division that it spent decades developing.

93.     Additionally, Troncale knew that Nano Banc would not have the expertise or the products to service clients and needed Shelby Pond (and, upon information and belief, Hasler) to build new products, platform for business, increase deposits, and other offerings.

94.     Upon information and belief, the principals of Nano Banc decided to take a shortcut on the long road to building a successful start-up bank by stealing AXOS's confidential and proprietary information (including AXOS's Trade Secrets), along with wrongfully soliciting AXOS's clients and employees, so that it could avoid the substantial investment of money, time, and effort needed to build the bank.  This included specifically recruiting Shelby Pond to help build the same type of platform AXOS had.  Upon information and belief, the same is true for Hasler, who thereafter knowingly and willingly became an active participant in this plan.

95.     On January 3, 2018, Nano Financial announced its plans to acquire Murrieta-based Commerce Bank of Temecula Valley for $23.3 million.

96.     That deal was finalized on or about April 30, 2018, through a merger, with the surviving banking entity to be called "Nano Banc" operating under the California charter acquired from Commerce Bank of Temecula Valley.

97.     In fact, AXOS has now learned that Troncale and Nano Banc's efforts to recruit Hasler and Pond began much earlier than previously thought. Specifically, Troncale contacted Hasler in at least February 2017—while Hasler was still working for AXOS—regarding the opportunity to join in the formation and creation of Nano Banc.  Upon information and belief, Hasler and Troncale thereafter included Pond in this scheme by at least March 2017—again, while Pond was still working for Nano.

98.     This involvement included, upon information and belief, meetings between Hasler, Pond, Troncale, and other members of the team scheming to create Nano Banc.  Upon information and belief, this involvement also included

conspiring and working on Nano Banc's business plan, such as with regards to onboarding new clients, including through the use of documents and information Hasler and Pond had taken from AXOS.  Hasler's further involvement included soliciting investors to invest in Nano Banc.

99.     Hasler's efforts to form Nano were extensive, including soliciting investors on Nano's behalf as early as March 2017.  In fact, by April 2017, Hasler was emailing potential investors about Nano Banc and telling them that Hasler would "be part of the C team."

100.     Upon information and belief, Hasler knew that his conduct was wrongful.  Such belief is evidenced by, *inter alia*, Hasler requesting that potential investors he was soliciting to "KEEP THIS AS CONFIDENTIAL AS POSSIBLE FROM WHERE IT CAME FROM SO I CAN DIRECT TO THE BD REP AS I STILL AM AT BOFI ( I CAN'T AFFORD TO LEAVE OR GET FIRED YET!!!)"

101.     Additionally, upon information and belief, Troncale was specifically and individually encouraging Hasler to hide his involvement with Nano Banc so that, once Nano Banc was fully formed and began operating, it could take AXOS's clients and deposits.  Upon information and belief, Troncale was also encouraging Hasler to try and obtain as much money from AXOS as he could prior to the formation and opening of Nano Banc.  In fact, in April 2017, Hasler asked for— and Troncale provided—advice on how to respond and communicate AXOS regarding his compensation.  Troncale advised Hasler to "lay under the radar. Then we take all their deposits…"

102.     Through its initial investigation, AXOS uncovered information that Nano Financial had contact with Hasler at least six months prior to this merger. Upon information and belief, and based upon additional information uncovered during the course of AXOS's initial investigation, Nano Financial also had contact with Fortney and Pond at least six months prior to the finalization of this merger.

///

103.     AXOS's further investigation has determined that this contact was far more extensive, and began far sooner, than earlier thought.  Specifically, AXOS's further investigation has now shown that, as discussed above, Hasler was actively working with Troncale and Nano Banc as early as February 2017.  Upon information and belief, this work began in coordination with and through the encouragement of Troncale.  AXOS's further investigation has also demonstrated that Pond began doing the same by at least March 2017.

104.     Thereafter, upon information and belief, Nano Banc, and its principals (and in particular Troncale), in coordination with and assisted by Hasler and Pond, continued to execute their plan to take a shortcut on the long road to building a successful start-up bank by stealing AXOS's confidential and proprietary information (including AXOS's Trade Secrets), along with wrongfully soliciting its clients and employees.

105.     Upon information and belief, such efforts included, *inter alia*, taking AXOS's documents and information and providing the same to Nano Banc to streamline certain processes, such as onboarding of clients.  For example, in March 2017, Hasler indicated that he and Pond would discuss "Digital onboarding process and documents gathering" as well as "Training of new employees culture and suggestions."  Pond respond that she was "on it" and noted that she "got some stuff from the office today and I think we're gonna be set."  Later, in April 2017, Hasler and Pond received an email from a member of the self-styled Nano Banc "business development team" asking to "sit down and talk around and on boarding process that we would like to see for our clients.  I know when we last spoke Shelby you were going to look at some of the paperwork that you use currently and programs to help us start a seamless electronic onboarding process."  Hasler responded that he would "get with Shelby and start adding docs that can show the actual process for different verticals."

///

SECOND AMENDED COMPLAINT

106.     These efforts paid dividends for Nano Banc, as within a few months after the completion of the merger described above, Hasler resigned from AXOS to join Nano Banc, which purports to provide services in the same line of business as the services offered by AXOS.  Upon information and belief, Hasler notified AXOS's clients of his intention to leave AXOS before his resignation and solicited them to move their business from AXOS to Nano Banc.

107.     AXOS's further investigation has demonstrated that, in the months between Nano Banc's formation and Hasler's resignation, he was working in coordination with Pond to actively solicit clients to move accounts from AXOS to Nano Banc, and/or to open new accounts with Nano Banc rather than with AXOS.

108.     Specifically, on or around June 11 2018—while both Hasler and Fortney were still employed by AXOS—Hasler emailed one of AXOS's clients to solicit it to move accounts from AXOS to Nano Banc, stating "Ideally and hopefully you could put all or a good portion of the funds that are at BOFI with Nano, but whatever you want to do would be greatly appreciated.  Upon information and belief, the content of this email was a template that Hasler, Pond, and/or Fortney sent to numerous of AXOS's clients during June 2018.

**Defendants' Misconduct**

109.     As discussed below, upon information and belief, Nano Banc and Troncale targeted Hasler, Pond, and others at AXOS in connection with the execution of their plan to take a shortcut on the long road to building a successful start-up bank by stealing AXOS's confidential and proprietary information (including AXOS's Trade Secrets), along with wrongfully soliciting its clients and employees.

110.     Upon information and belief, Hasler and Pond knowingly and willingly worked in concert with Nano Banc to take this shortcut by stealing from AXOS and wrongfully soliciting its clients and employees.  In fact, Hasler and Pond had an incentive to do so because, upon information and belief, their

compensation (including bonuses) was specifically tied to the deposits he brings to Nano Banc, including from AXOS's clients that they wrongfully solicited.  Indeed, upon information and belief, Hasler intended to be an executive of Nano Banc and so would have further benefits from every account he was able to move from AXOS to Nano Banc.

111.    Upon information and belief, Defendants' conduct sought to take advantage of AXOS's employees' (including Hasler, Shelby Pond, and Michael Fortney) knowledge of AXOS's confidential and proprietary information (including AXOS's Trade Secrets) through their disclosure of such information to Nano Banc in knowing violation of their obligations to AXOS, including under the agreements described above and in violation of the law.  Nano Banc and Troncale also did so knowing that it was acquiring AXOS's valuable information through improper means.  Specifically, upon information and belief, Troncale was encouraging Hasler to keep his involvement with Nano Banc secret with the intention of Nano Banc improperly soliciting AXOS's clients to move and/or open new accounts with Nano once Hasler had left AXOS.

112.    Upon information and belief, Nano Banc targeted Hasler, who it knew was a member of AXOS's valuable Specialty Deposits Division.  Hasler (and Pond) had access to and knowledge of crucial confidential and proprietary information (including AXOS's Trade Secrets), including information relating to AXOS's Specialty Deposits Division.  The disclosure of this information to, and use by, Defendants would be, and is, beneficial to Defendants and damaging to AXOS because it allows Defendants to, *inter alia*, wrongfully usurp AXOS's client relationships, including by directly contacting important decision-makers at its clients, and otherwise unfairly compete with AXOS.

113.    Upon information and belief, while still employed at AXOS, Hasler and Pond worked with Nano Banc to develop and implement a scheme to pilfer AXOS's Trade Secrets (including customer information), end their employment

with AXOS, and move to Nano Banc where Defendants (along with Fortney) could use the pilfered AXOS Trade Secrets to their benefit and AXOS's detriment.

114.    Upon information and belief, Hasler has served as the Executive Vice President and Division Manager of Commercial Banking at Nano Banc, doing the same work as he did with AXOS, developing sales and marketing strategy and partnerships to generate specialty deposits from 1031 exchange businesses, homeowner associations and other specialty banking customers.

115.    Upon information and belief, both during their employment with AXOS and after moving to Nano Banc, Hasler and Pond used AXOS's Trade Secrets (including customer information) in an attempt to solicit and induce customers to leave AXOS and transfer their business to Nano Banc, where Nano Banc and Hasler would benefit from their business activity, causing AXOS to lose business. Such solicitation also occurred extensively in the months between Pond joining Nano Banc and Hasler's resignation from AXOS, including both Hasler and Pond working in tandem to encourage numerous of AXOS's clients to move all of their deposits and accounts from AXOS to Nano Banc.

116.    Defendants' use of AXOS's Trade Secrets (including customer information) is beneficial to Defendants and damaging to AXOS because it allows Defendants to wrongfully usurp AXOS's client relationships by, *inter alia*, directly contacting important decision-makers at its clients, and otherwise unfairly compete with AXOS.

117.    Defendants' efforts to successfully and improperly solicit AXOS's clients have paid off.  Defendants successfully solicited AXOS's clients to transfer their highly valuable business to Nano Banc.  Upon information and belief, these solicitations took the form of, *inter alia*, direct contacts with AXOS's clients, both through Hasler while working at AXOS and after, soliciting them to end their business relationship with AXOS and to start a business relationship with Nano Banc.  These improper solicitations are apparent from the fact Nano Banc's total

deposits went from just over $150 million in June 2018 to over $450 million by December 2018 to over $650 million by June 2019 and over $825 million by the end of September 2019.  Such growth is highly unlikely for a start-up bank that only formed a few months prior to that, in May 2018.

118.    Upon information and belief, these clients who were solicited include AXOS's clients that Hasler and Pond worked with while at AXOS.

119.    Upon information and belief, Defendants were able to successfully solicit these clients because they used AXOS's Trade Secrets.

120.    Upon information and belief, Defendants' actions indicated a clear pattern and practice of using AXOS's Trade Secrets to solicit AXOS's clients to end their business relationship with AXOS and to start a business relationship at Nano Banc.

121.    Upon information and belief, Defendants' use of AXOS's Trade Secrets (including customer information), without AXOS's authorization or consent, to raid AXOS's clients is part of Defendants' plan and scheme to unfairly complete with AXOS.

122.    Upon information and belief, Defendants have attempted, and are continuing to attempt, to solicit additional clients from AXOS through use of AXOS's Trade Secrets (including customer information) and will continue such solicitation unless barred by this Court.

123.    Upon information and belief, as part of the scheme described herein and in an effort to wrongfully solicit clients away from AXOS, Defendants and/or Fortney told AXOS's clients that AXOS was ceasing its 1031 business.

124.    As a result of Defendants' wrongful conduct, AXOS has lost numerous clients and related accounts and/or new accounts, along with the associated deposits and revenue.  AXOS estimates it has lost a substantial sum due to Defendants' wrongful conduct, included in concert with others, as described herein.

125.     For example, Client A worked with Hasler while he was at AXOS. Upon information and belief, Defendants, in concert with Fortney, and Pond, wrongfully solicited Client A to leave AXOS and start a business relationship with Nano Banc, which Client A did and had AXOS send a check with Client A's funds to the attention of Fortney at Nano Banc.[2]

126.     In another example, Client B worked with Hasler while he was at Axos. Upon information and belief, Defendants, in concert with Fortney, and Pond, wrongfully solicited Client B to leave AXOS and start a business relationship with Nano Banc, which Client B did and reduced its business with AXOS by over 95%.   Since the departures described above, Client B has mistakenly sent new account requests to Pond's former AXOS email address, that were intended for her new email address at Nano Banc.

127.     In another example, Client C worked with Hasler while he was at Axos. Upon information and belief, Defendants, in concert with Fortney, and Pond, wrongfully solicited Client C to leave AXOS and start a business relationship with Nano Banc, which Client C did and reduced its business with AXOS substantially.  Since the departures described above, Client C has mistakenly sent emails to AXOS that were intended for Nano Banc.

128.     In another example, Client D worked with Hasler while he was at Axos. Upon information and belief, Defendants, in concert with Fortney, and Pond, wrongfully solicited Client D to leave AXOS and start a business relationship with Nano Banc, which Client C did and reduced its business with AXOS substantially.  Since the departures described above, Client D has mistakenly sent emails to AXOS that were intended for Nano Banc and/or evidence of wires to Nano Banc.

---

[2] AXOS has previously provided Defendants the real names of Clients A-F named herein pursuant to the Stipulated Protective Order entered in this Action, and will similarly provide the real names of Clients G-I upon Defendants' request of the same.

129.     In another example, Client E worked with Hasler while he was at Axos.  Upon information and belief, Defendants, in concert with Fortney, and Pond, wrongfully solicited Client E to leave AXOS and start a business relationship with Nano Banc, which Client E did and reduced its business with AXOS substantially.  Since the departures described above, Client E has sent wire transfers intended for Nano Banc.

130.     In another example, Client F worked with Hasler while he was at Axos.  Upon information and belief, Defendants, in concert with Fortney, and Pond, wrongfully solicited Client F to leave AXOS and start a business relationship with Nano Banc, which Client F did and reduced its business with AXOS substantially.  Since the departures described above, Client F has mistakenly sent emails to AXOS that were intended for Nano Banc.

131.     AXOS has been harmed by the aforementioned conduct, including the examples of lost revenue and business relationships with Clients A-F, in addition to other unnamed clients and losses, including but not limited to loss of deposits.

132.     Through its investigation in this Action, AXOS has learned that Hasler, Pond, Troncale, and Nano Banc's efforts to solicit clients to move their accounts from AXOS to Nano Banc were far more extensive than previously known.

133.     For example, upon information and belief Hasler and Fortney utilized AXOS's resources to solicit the business of Client G on AXOS's behalf for months.  This client expressed interest in opening accounts with AXOS at various points.  Rather than open accounts with AXOS, however, Hasler abruptly turned course in June 2018, telling Client G on June 11, 2018 the "Shelby is CC'd this email; I think we just get you guys on board here now and not send any money to BOFI. Shelby taught Micheal everything he knows and he and I will be over by July 1st and he will be on the tam servicing your accounts with the team and

personalized service."  Upon information and belief, Client G thereafter opened accounts with Nano Banc.

134.     In another example, on or about April 24, 2018, Hasler emailed Pond—while Hasler was still employed by AXOS, and Pond was employed by Nano Banc—to inform Pond that Client H would be opening accounts with Nano to "get this party started so to speak."  Upon information and belief, such action was taken with the encouragement, and at the direction of Troncale, as Hasler later told Client H on April 30, 2018 that "Mark told me to bring you last week."

135.     In another example, Pond and/or Hasler sent numerous of AXOS's clients emails in June 2018—while Hasler was still employed by AXOS— encouraging them to move "all or a good portion of the funds that are at BOFI with Nano."  Such action appears to be in compliance with, and at the direction of Troncale, who had previously told Hasler that they would "take all [AXOS's] deposits."

136.     In another example, Hasler attended a road show in or around June 2018, where he intended to visit multiple of AXOS's clients.  Prior to that show, Hasler asked Troncale for a Nano pitch book and/or on pagers, noting that printed copies would "really help and has a bigger impact than an IPAD……"  Upon information and belief, Hasler intended to use these documents to solicit AXOS's clients to move accounts to Nano Banc.

137.     In another example, Hasler received an inquiry from Client I on or about June 4—while Hasler was employed by AXOS—regarding potentially opening accounts with AXOS.  Hasler forwarded this inquiry to Pond on or around June 12, 2018, telling her: "got this inquiry from BOFI...I want to send here to Nano...can you please call her ASAP??? it would be so shady if I did it right now. Tell her the whole deal."

///

///

**Defendants Solicit AXOS Employees**

138.     Upon information and belief, Defendants implemented a plan to trade off of AXOS's hard work developing clients and employees, including in the Specialty Deposits Division.

139.     Upon information and belief, as part of this plan, Nano Banc successfully targeted Hasler and Pond for hire while they was still working for AXOS and they still had access to AXOS's confidential and proprietary information (including AXOS's Trade Secrets and AXOS's Confidential Information).

140.     In fact, AXOS's investigation has uncovered information that Nano Financial—along with the related entity associated with Troncale and Rebal that owns Nano Banc's trademarks—all had contact with Hasler and Pond for some time prior to the end of their respective tenures with AXOS.

141.     Specifically, Troncale contacted Hasler regarding Nano Banc as early as February 2017 for purpose of, upon information and belief, recruiting Hasler to join the creation and formation of Nano Banc and, ultimately, use the information and knowledge he had from AXOS to solicit AXOS's clients to move accounts to Nano Banc.  Indeed, Troncale encouraged Hasler to refrain from alerting AXOS to the fact Hasler intended to leave Nano, and suggested Hasler, Troncale, and Nano Banc would take all of AXOS's deposits (and clients).

142.     Hasler thereafter agreed to, and in fact did, solicit investors to invest in Nano Banc.  Again, this activity began as early as February or March 2017, over a year before Hasler resigned from AXOS to join Nano Banc.

143.     Hasler also began meeting with Troncale and other founding members of Nano Banc around this same time.  Upon information and belief, Hasler and Troncale eventually brought Pond into this conspiracy—beginning in at least March 2017—including to have her attend meetings with Troncale and other

members of what would become Nano Banc in place of Hasler so to not arouse AXOS's suspicions of the illicit conspiracy.

144. Hasler and Pond thereafter coordinated with Troncale and others to assist in Nano Banc's business development. This included, upon information and belief, coordinating on logos and other information, attending and conducting meetings, as well as uploading AXOS's documents (including its confidential information and Trade Secrets) to various locations for Nano Banc, including to assist Nano Banc in onboarding new clients, such as AXOS's clients.

145. Upon information and belief, Nano Banc—and Troncale in particular—and Hasler actively encouraged, induced, and recruited employees at AXOS to join Nano Banc, including while Hasler was still working at AXOS.

146. The AXOS employees recruited by Defendants had knowledge of and access to AXOS's Trade Secrets during their employment at AXOS.

147. Defendants recruited these AXOS employees with whom Hasler worked at AXOS to leave their employment with AXOS and to join him at Nano Banc (in some cases in advance of his departure from AXOS), where they would utilize pilfered AXOS Trade Secrets to solicit deposits and business from AXOS's customers. Upon information and belief, the plan was conceived and implemented months before any of them left AXOS.

148. Upon information and belief, Hasler exercised a level of influence and control over these employees, such that they would comply with his requests and would be unlikely to take action that would harm Hasler's relationships with clients or what he considered his "book of business."

149. On August 15, 2016, AXOS hired Fortney as a Specialty Banking Client Support Representative to work in its Specialty Deposits Division. Fortney remained a member of AXOS's Specialty Deposits Division until his resignation from AXOS on June 19, 2018, when he left to join Nano Banc where he would soon be joined by Hasler.

150.     Upon Fortney's resignation from AXOS, Hasler feigned ignorance and surprise about such resignation.  AXOS's recent investigations have demonstrated, however, that Hasler knew of Fortney's intention to join Nano well in advance of his June 19, 2018 resignation, and in fact was instrumental in Fortney's transition from AXOS to Nano Banc.  Moreover, upon information and belief, Hasler told numerous of AXOS's clients of Fortney's impending resignation from AXOS and move to Nano Banc in advance of his June 19, 2018 resignation, and in fact encouraged some such clients to open new accounts with Nano once such resignation was complete.

151.     On July 12, 2012, AXOS hired Pond as a Director Banker.  Pond thereafter briefly left AXOS, before being re-hired on December 1, 2014 as an Inbound Direct Banker.  Pond held this position until approximately July 2, 2015, when she assumed the role of Specialty Deposits Relationship Manager.  Pond thereafter worked as a Relationship Manager in the Business Banking department, working directly with the Specialty Deposits Division.  Pond remained a member of AXOS's Specialty Deposits Division until she was let go by AXOS on March 28, 2018.  Upon information and belief, Pond was already being recruited by Nano Banc at this time, and was already planning to leave to join Nano Banc, which she did and where she would soon be joined by Hasler.  Indeed, as discussed further above, Pond began working with Hasler and Troncale and on behalf of Nano Banc in at least March 2017.  This included conducting and attending meetings, providing input on various aspects of Nano Banc's creation and formation, and, upon information and belief, providing Nano Banc with information and documents obtained from, and belonging to, AXOS in order to, *inter alia*, streamline Nano Banc's startup timeline and streamline onboarding of new clients (including AXOS's clients)

152.     In the months leading up to Hasler's resignation from AXOS on July 2, 2018, to join Nano Banc, he all but ceased bringing new accounts to AXOS,

which was extremely unusual given his past history.  Additionally, during this time, Hasler was spending excessively and without authorization on non-business related expenses on his AXOS credit card, which was in violation of his obligations to AXOS.  Such actions, upon information and belief, were in furtherance of Defendants' scheme and related wrongful actions to harm AXOS.

153.    AXOS's recent investigation has now shown that, during the last months of his employment with AXOS, Hasler was in fact encouraging AXOS's clients to open new accounts with Nano Banc, as well as transfer existing deposits from AXOS to Nano Banc.  On top of that, upon information and belief, Hasler also encouraged AXOS's potential clients to open accounts with Nano Banc instead of AXOS.  This included at least one client whose business Hasler and Fortney had solicited on AXOS's behalf, using AXOS's resources, and who had expressed interest and eagerness in opening accounts with AXOS.  Despite this, Hasler failed to open any accounts for this client with AXOS, but instead specifically directed the client to open accounts with Nano Banc—all while Hasler was still employed by AXOS.

154.    Upon information and belief, on the day that Fortney resigned from AXOS, Fortney in concert with Nano Banc and Hasler, deleted a folder with client information (which AXOS was later able to recover) in furtherance of the scheme described herein to harm AXOS (and acting in concert with Nano Banc and Hasler).  Such harm included harming its relationship with its clients and interfering with its ability to conduct business.

155.    Upon information and belief, Defendants' actions in recruiting Hasler, Fortney, and Pond to leave their employment with AXOS and join Nano Banc was part of a pre-planned and coordinated effort to harm AXOS's business and bolster the interests of a competing enterprise.

///

///

**AXOS's Delayed Discovery of Facts Sufficient to State Claims Against Troncale, Individually, and Pond**

156.     AXOS filed its initial complaint on October 31, 2019.  Such complaint was based upon the internal investigation it had completed to that time, as well as good faith beliefs.

157.     AXOS thereafter continued its investigation into the relevant facts underlying AXOS's claims, including by conducting extensive discovery in this action against Nano Banc, and then Hasler once he was joined as a defendant.

158.     Nano Banc and Hasler delayed providing responses and producing documents in this action.

159.     Nano Banc's (and eventually Hasler's) delays and refusals to provide certain documents and information eventually led to AXOS serving dozens of subpoenas on third parties, as well as requiring multiple informal discovery conferences before the Magistrate Judge to whom this action is assigned.

160.     Those additional efforts proved fruitful, as AXOS was eventually able to obtain additional documents to support its claims.  Specifically, Defendants' produced documents on each of August 30, 2022, September 6, 2022, October 3, 2022, October 4, 2022, October 7, 2022, and December 25, 2022.  These productions included more than 60,000 total documents and over 200,000 pages.

161.     Defendants' substantial document productions not only support AXOS's claims alleged in the First Amended Complaint, but also clearly demonstrate that the conspiracy between Hasler and Nano Banc began much earlier than previously thought, and that it also included Troncale and Pond within its scope.

162.     For example, at the time AXOS filed its initial and first amended complaints, AXOS believed Hasler had conspired with Nano Banc, including to misappropriate AXOS's Trade Secrets and interfere with AXOS's relationships both with its employees (including Pond) and clients.  AXOS was unaware,

however, that this conspiracy had begun as early as February 2017, and had no way to know this until documents produced by Nano Banc and Hasler demonstrated the same.  AXOS had previously attempted to obtain documents establishing the scope of Defendants' conspiracy, including through document requests served on Nano Banc as early as February 26, 2020.  It was not until Defendants' recent document productions (including those made on October 7, 2022), however, that AXOS was able to identify that Hasler, Troncale, and Nano Banc began their conspiracy in at least February 2017.

163.     Similarly, when AXOS filed its initial and first amended complaints, AXOS believed that Hasler and Nano Banc had conspired to solicit Pond to leave AXOS and join Nano Banc.  AXOS had similarly sought information on Nano's relationship with Pond, including through discovery requests served on Nano as early as February 26, 2020.  Despite AXOS's efforts, however, Defendants had previously failed to produce such documents.  AXOS was unaware, therefore, that Pond had in fact been involved in the creation and formation of Nano Banc, and had been working on its behalf since at least March 2017, and was unable to ascertain the same until Nano Banc's and Hasler's recent document productions (including Defendants' documents produced on October 7, 2022).

164.     Finally, at the time AXOS filed its initial and amended complaint, AXOS was unaware of the extent Troncale was individually involved in the solicitation and encouragement of Hasler and Pond to not only work on Nano Banc's behalf, but to misappropriate AXOS's documents and information (including AXOS's Trade Secrets) and to use the same to, *inter alia*, solicit AXOS's clients to move their business to Nano Banc.  It was once again only through Defendants' recent document productions (including those made on October 7, 2022), that AXOS learned the extent of Troncale's individual actions.

165.     Nano Banc and Hasler's recent document productions—made on August 30, 2022, September 6, 2022, October 3, 2022, October 4, 2022, October 7,

2022, and December 25, 2022—provided AXOS with facts and information sufficient to support claims against Pond and Troncale, which the information previously available to AXOS did not.  In particular, AXOS did not wish to individually name Nano Banc's corporate officers until it had information to establish any such officer personally participated in the alleged conspiracy.

166.     AXOS was unable to discover facts sufficient to support claims against Troncale and Pond due to, *inter alia*, Nano Banc and Hasler's deceit and delay.  As such, AXOS is only now able to bring its claims against Troncale and Pond.

**FIRST CAUSE OF ACTION**

**(Misappropriation of Trade Secrets -- 18 U.S.C. § 1836)**

**(Against all Defendants)**

167.     AXOS incorporates by reference and realleges the allegations in paragraphs 1-166 as if fully set forth herein.

168.     This action arises under the Defend Trade Secrets Act of 2016, codified at 18 U.S.C. § 1836.

169.     AXOS owns valuable confidential and proprietary information and trade secrets, including, but not limited to AXOS's Trade Secrets.  AXOS has taken reasonable measures to keep such information secret.  AXOS derives independent economic value, actual or potential, from its Trade Secrets not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from disclosure or use of the same.

170.     AXOS has expended substantial time, effort, and money in developing AXOS's Trade Secrets over the course of many years of doing business.  AXOS's Trade Secrets are vital to maintaining its business and competitive advantage in the marketplace.

///

///

171.     AXOS's Trade Secrets include the valuable confidential and proprietary information that it has developed and maintained over many years, including relating to the Specialty Deposits Division.

172.     AXOS has also taken reasonable steps, such as through password protection, the execution of confidentiality agreements, and other means to maintain the secrecy of AXOS's Trade Secrets.

173.     Hasler and Pond obtained, used, and disclosed to Nano Banc, AXOS's Trade Secrets through improper means, and in excess of and/or without AXOS's authorization and consent.  Nano Banc further obtained AXOS's Trade Secrets through improper means, as Hasler, Pond, and Fortney gained access to AXOS's Trade Secrets during and through the course of their work with AXOS, under an obligation to maintain the secrecy of the information, and have wrongfully used and disclosed that information to Defendants for their benefit without AXOS's authorization or consent.

174.     Upon information and belief, Nano—and in particular Troncale—targeted Hasler, Pond, and Fortney for hire, at least in part, because of their knowledge of and access to AXOS's Trade Secrets, and for the purpose of acquiring AXOS's Trade Secrets. Upon information and belief, Hasler assisted Nano Banc and Troncale in their targeting of Fortney and Pond.

175.     Nano improperly, and without authorization, and in furtherance of its scheme and conspiracy with Haser and Pond—and with Hasler's and Pond's assistance—improperly acquired AXOS's Trade Secrets from Hasler, Fortney, and Pond who brought them to Nano Banc in order to aid Defendants in unfairly competing with AXOS, and in breach of their confidentiality and other obligations to AXOS.  Indeed, such improper acquisition began, upon information and belief, as early as April 2017.

176.     Nano acquired AXOS's Trade Secrets from Hasler, Fortney, and Pond and knew, or had reason to know, that they had been acquired through improper

means, and without authorization.  Such acquisition was done at the specific direction of, and with encouragement from, Nano Banc, as well as Troncale specifically.

177.     Hasler and Pond knew, or had reason to know, that their own (as well as their inducement of Fortney's) improper acquisition, use, and disclosure of AXOS's Trade Secrets to Nano Banc was done by improper means and without authorization.

178.     By way of the conspiracy between Nano, Hasler, and Pond (as well as Fortney), Defendants are liable for the misappropriation and other wrongful acts of each of them.

179.     Defendants are in direct competition with AXOS and have, and are currently, benefitting from AXOS's Trade Secrets and, thus, AXOS has, and will continue to suffer imminent and irreparable harm as a result of Defendants' misappropriation.

180.     Defendants' conduct has caused harm to AXOS, including the loss of clients, employees, and business, in an amount to be determined at trial.

181.     Upon information and belief, Defendants' misappropriation of AXOS's Trade Secrets is ongoing and will continue unless and until temporarily and permanently restrained.  The harm AXOS will suffer if Defendants are not restrained includes the loss of its current and potential clients and decreased profits.

182.     AXOS has no adequate remedy at law to rectify Defendants' misappropriation.

**SECOND CAUSE OF ACTION**

**(Intentional Interference with Contractual Relations)**

**(Against all Defendants)**

183.     AXOS incorporates by reference and realleges the allegations in paragraphs 1-182 as if fully set forth herein.

184.     AXOS had entered into valid contracts with certain clients.

185.     AXOS had entered into valid contracts with certain at-will employees, including Hasler, Fortney, and Pond relating to the protection of its confidential and proprietary information (including AXOS's Trade Secrets).  These contracts include the Non-Disclosure Agreement, Pay Plan, and Confidentiality Agreement discussed above.

186.     Upon information and belief, Nano Banc knew of the contracts between AXOS and its clients, because, *inter alia*, Hasler and/or others disclosed this information to Nano Banc and as imputed through Hasler's and Pond's roles and titles at Nano Banc.  Troncale knew of these contracts because, upon information and belief, Hasler used Troncale as a confidant of sorts, explaining his relationship with and knowledge of AXOS to Troncale and receiving advice in return on how best to benefit Hasler, Troncale, and Nano Banc.  Hasler and Pond knew of these contracts because, *inter alia*, they worked with these clients while at AXOS.

187.     Hasler and Pond also knew of the protections and heightened obligations they owed to AXOS pursuant to the agreements referenced herein that they executed, including their heightened obligations to AXOS to protect its confidential and proprietary information (including AXOS's Trade Secrets), and prevent the raiding of AXOS of its clients and employees under certain circumstances.

188.     At the very latest, Nano Banc knew of the contracts between AXOS and its employees, such as Hasler, relating to the protection of its confidential and proprietary information (including AXOS's Trade Secrets) as of August 8, 2019 (but very likely knew well before this point).  On August 8, 2019, AXOS filed a cross-complaint against Hasler in a pending arbitration between AXOS and Hasler in which it described those contracts and that Hasler had entered into those contracts.  Counsel for Nano Banc in the CBB Related Action represents Hasler in

the pending arbitration between AXOS and Hasler.  In light of the allegations against Hasler in AXOS's cross-complaint in the pending arbitration, including relating to Nano Banc, and given that Hasler and Nano Banc share the same counsel, upon information and belief, Nano Banc knows of the allegations in that cross-complaint, including Hasler's contractual obligations to AXOS, and upon information and belief is contributing toward the payment of Hasler's legal fees in that arbitration.

189.    Moreover, upon information and belief, Nano Banc requires its employees, such as Hasler and Pond, to inform it of contracts similar to those between AXOS and its employees.

190.    Upon information and belief, Defendants' conduct was intended to disrupt performance of these contracts, or Defendants knew that their conduct was certain or substantially certain to cause such disruption.  Such intention and/or knowledge is evidenced by Defendants' wrongful acts described herein, including their efforts to procure AXOS's confidential and proprietary information (including AXOS's Trade Secrets) from AXOS's employees (including Hasler, Pond, and Fortney).  Such intention and/or knowledge is further evidenced by Defendants' wrongful acts to induce or otherwise cause AXOS's employees to use such information while working for Nano Banc without AXOS's consent, which Defendants knew violated those employees' contractual obligations to AXOS. Such intention and/or knowledge is further evidenced by the use of such information to solicit AXOS's clients and employees in violation of AXOS's employees' obligations to AXOS.

191.    Defendants' knowing and intentional acts fall outside the boundaries of fair competition in that they, *inter alia*, involved unlawfully misappropriating AXOS's Trade Secrets and using same to hire AXOS's at-will employees and steal AXOS's current clients and prospective clients, inducing AXOS's employees to violate their contractual and legal obligations to AXOS, and unfair competition.

192.     Defendants' conduct prevented performance or made performance more expensive or difficult and in some cases caused the termination of AXOS's contracts with its clients and caused Hasler, Fortney, and Pond to breach their contractual obligations to AXOS.

193.     By way of the conspiracy between Nano, Hasler, and Pond (as well as Fortney), Defendants are liable for the misappropriation and other wrongful acts of each of them.

194.     As a consequence of Defendants' intentional conduct, AXOS has been damaged in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**

**(Intentional Interference with Prospective Economic Relations)**

**(Against All Defendants)**

195.     AXOS incorporates by reference and realleges the allegations in paragraphs 1-194 as if fully set forth herein.

196.     AXOS had an economic relationship with its at-will employees including, but not limited to, Hasler, Fortney, and Pond, as well as AXOS's current clients and prospective clients.

197.     These economic relationships presented a high probability of future economic benefit to AXOS and AXOS has invested substantial resources in developing and maintaining these relationships, which include through training, developing its banking divisions and related services, including the Specialty Deposits Division and its valuable 1031 exchange, and homeowners' association business.

198.     Hasler knew of these relationships and their value because, *inter alia*, he worked with these employees and clients while at AXOS and he was experienced in this field.

199.     Upon information and belief, Nano Banc knew of these relationships and their value by way of, *inter alia*, its principals'—including Troncale—

experience in the banking field, knowledge of the high value of the deposits and account-related and transactional fee and deposit income (including those related to the 1031 exchange business) they generate, and the disclosure of such relationships to Nano Banc and Troncale by Hasler, Pond, and AXOS's other former employees.

200.    Upon information and belief, Hasler and Pond violated their contractual and fiduciary duties to AXOS and Defendants have misused AXOS's confidential and proprietary information (including AXOS's Trade Secrets), and without AXOS's consent, to solicit AXOS's at-will employees, potential clients, and actual clients.

201.    Defendants have willfully and deliberately committed the wrongful acts alleged herein with the intent to interfere with the at-will employment relations between AXOS and its at-will employees, as well as AXOS's relations with its clients and prospective clients, which Hasler and Pond knew to exist because, *inter alia*, they worked with these employees and clients while at AXOS and, upon information and belief, wrongfully divulged that information to Nano Banc and Troncale.

202.    Defendants' wrongful acts, as set forth above, caused injurious interference with, and disruption of, the at-will employment relations between AXOS and its at-will employees to occur (including through AXOS's employees joining Nano Banc after their resignation and/or termination from AXOS, and violating of obligations to AXOS), as well as AXOS's relations with its current clients and prospective clients, which include AXOS's clients' termination (or significant decrease) of their relationship with AXOS.

203.    Defendants' knowing and intentional acts fall outside the boundaries of fair competition in that they, *inter alia*, involved Hasler and Pond violating their contractual obligations and fiduciary duties owed to AXOS, Defendants unlawfully misappropriating AXOS's Trade Secrets and using same to target AXOS's key at-

will employees for hire (including through obtaining key intelligence regarding the value, nature, pricing, and other information on valuation relating to AXOS clients) and steal AXOS's current clients and prospective clients, Defendants' inducing AXOS's employees to violate their contractual and legal obligations to AXOS, and unfair competition.

204.     By way of the conspiracy between Nano, Hasler, and Pond (as well as Fortney), Defendants are liable for the misappropriation and other wrongful acts of each of them.

205.     As a proximate result of Defendants' conduct, AXOS has suffered injury and damage to its business and goodwill in an amount to conform to proof at trial, but in no event less than the jurisdictional minimum of this Court.

206.     Defendants' acts in interfering with AXOS's at-will employment relations with its employees, as well as economic relations with AXOS's current clients and prospective clients were willful and malicious, and designed to obstruct and otherwise interfere with the successful operation of AXOS's business.  AXOS therefore is entitled to recover exemplary and punitive damages in a sum sufficient to punish Defendants.

**FOURTH CAUSE OF ACTION**

**(Negligent Interference with Prospective Economic Relations)**

**(Against All Defendants)**

207.     AXOS incorporates by reference and realleges the allegations in paragraphs 1-206 as if fully set forth herein.

208.     AXOS had an economic relationship with its at-will employees including, but not limited to, Hasler, Fortney, and Pond, as well as AXOS's current clients and prospective clients.

209.     These economic relationships presented a high probability of future economic benefit to AXOS and AXOS has invested substantial resources in developing and maintaining these relationships, which include through training,

-46-

SECOND AMENDED COMPLAINT

developing its banking divisions and related services, including the Specialty Deposits Division and its valuable 1031 exchange, and homeowners' association business.

210.    Hasler and Pond knew of these relations, including because, *inter alia*, he worked with these employees and clients while at AXOS, and knew that they were likely to be disrupted if he, or Nano Banc, failed to act with reasonable care.

211.    Upon information and belief, Nano Banc knew of these relationships and their value by way of, *inter alia*, its principals'—including Troncale— experience in the banking field, knowledge of the high value of the deposits and account-related and transactional fee income (including those related to the 1031 exchange business) they generate, and the disclosure of such relationships to Nano Banc by Hasler and AXOS's other former employees.  Troncale further knew of these relationships because, upon information and belief, Hasler repeatedly and periodically would provide Troncale with information about business opportunities he had received through his position with AXOS.

212.    Upon information and belief, Defendants failed to act with reasonable care by, *inter alia*, Hasler and Pond violating their contractual obligations and fiduciary duties owed to AXOS, and Defendants unlawfully misappropriating AXOS's confidential and proprietary information (including AXOS's Trade Secrets), and without AXOS's consent, to solicit AXOS's at-will employees including, but not limited to, Hasler, Fortney, and Pond, as well as to solicit AXOS's current clients and prospective clients, including through Defendants' presentation of pricing proposals that were based on AXOS's agreements and/or arrangements with its clients and were intended to "beat" AXOS's pricing arrangements with its clients.

213.    Defendants' failure to act with reasonable care by committing wrongful acts, as set forth above and including through the misappropriation of AXOS's Trade Secrets, caused injurious interference with, and disruption of, the

at-will employment relations between AXOS and its at-will employees, along with AXOS's relations with its clients.

214.     By way of the conspiracy between Nano, Hasler, and Pond (as well as Fortney), Defendants are liable for the misappropriation and other wrongful acts of each of them.

215.     As a proximate result of Defendants' wrongful and negligent conduct, AXOS has suffered injury and damage to its business and goodwill in an amount to conform to proof at trial, but in no event less than the jurisdictional minimum of this Court.

### FIFTH CAUSE OF ACTION

### (Breach of Contract)

### (Against Hasler)

216.     AXOS incorporates by reference and realleges the allegations in paragraphs 1-215 as if fully set forth herein.

217.     AXOS entered into valid and enforceable contracts with Hasler, the material terms of which are discussed above and attached hereto.  Such contracts included the Non-Disclosure Agreement, the Pay Plan, and the Confidentiality Agreement (collectively, the "Axos/Hasler Agreements").

218.     AXOS performed all its obligations under the Axos/Hasler Agreements, except for any obligations that were excused.

219.     AXOS never relieved Hasler of his obligations set forth in the Axos/Hasler Agreements.

220.     Hasler breached the Axos/Hasler Agreements by, among other actions, improperly using and disclosing AXOS's confidential and proprietary information (including AXOS's Trade Secrets), without AXOS's authorization and consent, during and after his resignation from AXOS.

221.     Hasler's breaches of the Axos/Hasler Agreements were a substantial factor in causing, and has caused harm to AXOS, including through the loss of

clients, employees, and business, in an amount to conform to proof at trial, but in no event less than the jurisdictional minimum of this Court.

## SIXTH CAUSE OF ACTION

### (Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*)

### (Against All Defendants)

222.     AXOS incorporates by reference and realleges the allegations in paragraphs 1-221 as if fully set forth herein.

223.     Upon information and belief, Hasler's violations of his contractual obligations and fiduciary duties to AXOS, Defendants' misuse and unlawful misappropriation of AXOS's Trade Secrets, along with their wrongful acts inducing AXOS's former employees to breach their contractual obligations and duties to AXOS and to wrongfully solicit AXOS's clients and employees, to compete against AXOS as described herein constitutes unlawful and/or unfair business practices or acts in violation of Section 17200 et seq. of the California Business and Professions Code and California common law.

224.     As a direct and proximate result of Defendants' unlawful and unfair business practices, AXOS has suffered and will continue to suffer substantial pecuniary losses and irreparable injury to its business reputation and goodwill.  As such, AXOS's remedy at law is not adequate to compensate for injuries inflicted by Defendants.  Accordingly, AXOS is entitled to temporary, preliminary, and permanent injunctive relief.

225.     By way of the conspiracy between Nano, Hasler, and Pond (as well as Fortney), Defendants are liable for the misappropriation and other wrongful acts of each of them.

///

///

///

///

## **SEVENTH CAUSE OF ACTION**

### **(Breach of Contract)**

### **(Against Pond)**

226.      AXOS incorporates by referened and realleges the allegations in paragraphs 1-225 as if fully set forth herein.

227.      AXOS entered into valid and enforceable contracts with Pond, the material terms of which are discussed above and attached hereto.  Such contracts included the Non-Disclosure Agreement, the Pay Plan, and the Confidentiality Agreement (collectively, the "Axos/Pond Agreements").

228.      AXOS performed all its obligations under the Axos/ Pond Agreements, except for any obligations that were excused.

229.      AXOS never relieved Pond of her obligations set forth in the Axos/ Pond Agreements.

230.      Pond breached the Axos/ Pond Agreements by, among other actions, improperly using and disclosing AXOS's confidential and proprietary information (including AXOS's Trade Secrets), without AXOS's authorization and consent, during and after her resignation from AXOS.

231.      Pond's breaches of the Axos/ Pond Agreements were a substantial factor in causing, and has caused harm to AXOS, including through the loss of clients, employees, and business, in an amount to conform to proof at trial, but in no event less than the jurisdictional minimum of this Court.

///

///

///

///

///

///

///

## **PRAYER FOR RELIEF**

WHEREFORE, AXOS respectfully requests that this court:

1.      Award AXOS compensatory and consequential damages against Defendants, according to proof;

2.      Issue a preliminary and permanent injunction:

    a.  Prohibiting Defendants (including, *inter alia*, any of its employees, officers, directors, affiliates, agents, and contractors) from using, disclosing or otherwise transferring AXOS's confidential and proprietary information (including AXOS's Trade Secrets), and any other materials taken from AXOS without its consent, and to require Defendants to immediately return all such information and materials to AXOS;

    b.  Prohibiting Defendants from competing against AXOS through the use of AXOS's Trade Secrets for so long as it is reasonably necessary to prevent Defendants from reaping and/or gaining any unfair advantage or other benefit as a direct or proximate result of its unlawful conduct, including the misappropriation and misuse of AXOS's confidential and proprietary information (including AXOS's Trade Secrets);

    c.  Prohibiting Defendants from soliciting business or any other corporate opportunities from any employees, clients, suppliers, investors, vendors or potential clients, suppliers, investors or vendors derived as a result of AXOS's confidential and proprietary information (including AXOS's Trade Secrets) wrongfully misappropriated from AXOS;

    d.  Prohibiting Defendants from continuing to solicit for employment any and all current AXOS employees through use of AXOS's confidential

-51-

SECOND AMENDED COMPLAINT

and proprietary information (including AXOS's Trade Secrets)
wrongfully misappropriated from AXOS;

e.   Requiring Defendants to provide to AXOS a list of every current and
     former employee of AXOS solicited by Defendants or any of their
     agents, employees, salespeople, recruiters, and all others acting in
     concert;

f.   Requiring Defendants to designate a corporate representative pursuant
     to Federal Rule of Civil Procedure section 30(b)(6) to testify on its
     behalf at a deposition on an expedited basis, along with the production
     of documents relating to the wrongdoing alleged herein, within a time
     to be determined;

g.   Requiring Defendants to undergo a forensic investigation by a third-
     party neutral, at Defendants' expense, of the computers,
     communication and information systems (including, *inter alia*, tablets,
     USB drives, PDAs, phones, hard drives, and email accounts, both
     professional and personal) of Hasler, Fortney, Pond, and all other
     employees, officers, directors, affiliates, agents, and contractors of
     Defendants who had access to AXOS's information, as well as their
     spouses, significant others, and family members, to capture and
     identify all media in the possession, custody or control of Defendants
     (including Defendants' employees, officers, directors, affiliates,
     agents, contractors, and all others acting in concert with Defendants,
     and their family members) and to isolate and remove from
     Defendants' (including Defendants' employees, officers, directors,
     affiliates, agents, contractors, and all others acting in concert with
     Defendants, and their family members) systems all documents, data,
     and other property of AXOS, including AXOS's Trade Secrets and

1        other confidential and proprietary information that Hasler, Fortney,

2        and Pond acquired through their work with AXOS or otherwise;

3      3.      That AXOS further be awarded an amount of lost profits in an amount

4  to be proven at trial to recover from Defendants' intentional interference with

5  AXOS's contractional relations;

6      4.      That AXOS further be awarded an amount of lost profits in an amount

7  to be proven at trial to recover from Defendants' intentional and negligent

8  interference with AXOS's prospective economic advantage;

9      5.      That AXOS further be awarded restitution (i.e., disgorgement) of all

10  money, property, and benefits wrongfully obtained by Defendants;

11      6.      That Nano Banc return all benefits it has received due to its unjust

12  enrichment at the expense of AXOS, including all profits derived from its wrongful

13  conduct;

14      7.      That AXOS further be awarded exemplary and punitive damages

15  against Defendants in a sum sufficient to punish and make an example of

16  Defendants;

17      8.      That AXOS be awarded its attorneys' fees and costs of suit incurred

18  herein;

19      9.      For pre- and post- judgement interest; and

20      10.     For such other and further relief as the Court may deem just and

21  proper.

22

23  Date: February 22, 2023           Respectfully submitted,

24                            /s/ *Zachary T. Timm*

25                            Christina N. Goodrich
                          Zachary T. Timm
26                            **K&L Gates LLP**

27                            *Attorneys for Plaintiff AXOS BANK*

28

1
2
## **DEMAND FOR JURY TRIAL**
3        Plaintiff AXOS Bank formerly known as BofI Federal Bank hereby
4   demands a trial by jury on every issue on which it is so entitled.
5
6
7   Date: February 22, 2023                Respectfully submitted,

8                                          /s/ *Zachary T. Timm*

9                                          Christina N. Goodrich
                                           Zachary T. Timm
10                                         **K&L Gates LLP**

11                                         *Attorneys for Plaintiff AXOS BANK*
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28