UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 19-2092 JGB (SHKx)** | Date | August 28, 2024 |
|---|---|---|---|
| Title | ***Axos Bank v. Nano Banc, et al.*** | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** Order (1) DENYING Defendants' Motion for Summary Judgment (Dkt. Nos. 129, 130); and (2) VACATING the September 9, 2024 Hearing (IN CHAMBERS)

Before the Court is a motion for summary judgment brought by defendants Nano Banc ("Nano"), Robert Hasler ("Hasler"), Mark Troncale ("Troncale"), and Shelby Pond, now Shelby Martello ("Martello") (collectively, "Defendants"). ("Motion," Dkt. Nos. 129, 130.) The Court finds this matter appropriate for resolution without a hearing. Fed. R. Civ. P. 78; L.R. 7-15. Upon consideration of the papers filed in support of and in opposition to the Motion, the Court **DENIES** the Motion. The hearing set for September 9, 2024 is **VACATED**.

## I. BACKGROUND

On October 31, 2019, plaintiff Axos Bank ("Plaintiff" or "Axos") initiated this action against defendants Nano and Does 1 through 10, inclusive. ("Complaint," Dkt. No. 1.) The Complaint alleges six claims: (1) misappropriation of trade secrets, 18 U.S.C. § 1836; (2) misappropriation of trade secrets, Cal. Civ. Code § 3426, et seq.; (3) intentional interference with contractual relations; (4) intentional interference with prospective economic advantage; (5) negligent interference with prospective economic advantage; (6) violation of California's Unfair Competition Law, Cal. Civ. Code §§ 17200, et seq. ("UCL"). (See id.)

On October 22, 2021, Plaintiff filed a first amended complaint. ("FAC," Dkt. No. 43.) On April 17, 2023, Plaintiff filed a second amended complaint. ("SAC," Dkt. No. 83.) Plaintiff brings the SAC against defendants Nano, Hasler, Troncale, Martello, and Does 1 through 10, inclusive. (Id.) Plaintiff alleges seven claims: (1) misappropriation of trade secrets, 18 U.S.C. §

1836; (2) intentional interference with contractual relations; (3) intentional interference with prospective economic advantage; (4) negligent interference with prospective economic advantage; (5) breach of contract (as to Hasler); (6) violation of UCL; and (7) breach of contract (as to Martello).  (See id.)

On June 21, 2024, Defendants filed an application to file the Motion under seal.  (Dkt. Nos. 126-127.)  The same day, Plaintiff filed a declaration in support of Defendants' request to file the Motion under seal.  (Dkt. No. 128.)  On July 1, 2024, Defendants filed the Motion.  (See Motion.)  In support of the Motion, Defendants filed the following documents:

- Defendants' Statement of Uncontroverted Facts and Conclusions of Law ("SUF," Dkt. Nos. 129-2, 130-1);
- Declaration of Jonathan Yank with attached exhibits ("Yank Decl.," Dkt. Nos. 126-1, 129-6, 130-4, 175);
- Notice of Errata for Yank Decl. ("Yank Decl. Errata," Dkt. Nos. 174, 175);
- Declaration of Robert Hasler with attached exhibits ("Hasler Decl.," Dkt. Nos. 129-3, 130-2);
- Declaration of Shelby Martello with attached exhibits ("Martello Decl.," Dkt. No. 129-4);
- Declaration of Mark Troncale with attached exhibits ("Troncale Decl.," Dkt. Nos. 129-5, 130-3);
- Declaration of Isaac R. Zfaty with attached exhibits ("Zfaty Decl.," Dkt. Nos. 178-179); and
- Application to Seal Documents (Dkt. No. 126).

On July 15, 2024, Plaintiff filed an application to file an opposition to the Motion under seal.  (Dkt. Nos. 168, 173.)  On July 23, 2024, Defendants filed a joinder in support of Plaintiff's applications for leave to file documents under seal—this includes the opposition.  (Dkt. No. 183.)  On July 15, 2024, Plaintiff opposed the Motion.  ("Opposition," Dkt. Nos. 133, 138, 147-1.)  In support, Plaintiff filed the following documents:

- Notice of Errata for Opposition ("Opposition Errata," Dkt. Nos. 172-173);
- Plaintiff's Statement of Genuine Disputes of Material Fact ("SUF Opposition," Dkt. Nos. 133-1, 147-2, 173 at Ex. C (corrected version));
- Plaintiff's Additional Material Facts ("AMF," Dkt. Nos. 133-1, 147-2, 173 at Ex. C (corrected version));
- Evidentiary Objections ("Evidentiary Objections," Dkt. Nos. 135, 141-12, 163-12);
- Declaration of Crystal Simpson with attached exhibits ("Simpson Decl.," Dkt. Nos. 136, 141-1, 163);
- Declaration of David Park with attached exhibits ("Park Decl.," Dkt. Nos. 137, 148-1, 173-1);
- Declaration of Zachary T. Timm with twelve volumes of exhibits, listed below ("Timm Decl.," Dkt. No. 139);
    - Volume I ("Volume I," Dkt. Nos. 139-1, 154);

- - o Volume II ("Volume II," Dkt. Nos. 140-141, 155);
  - o Volume III ("Volume III," Dkt. Nos. 142, 148, 156);
  - o Volume IV ("Volume IV," Dkt. Nos. 149, 170);
  - o Volume V ("Volume V," Dkt. Nos. 150, 157);
  - o Volume VI ("Volume VI," Dkt. Nos. 151, 158);
  - o Volume VII ("Volume VII," Dkt. Nos. 152, 159);
  - o Volume VIII ("Volume VIII," Dkt. Nos. 169, 160);
  - o Volume IX ("Volume IX," Dkt. Nos. 153, 161);
  - o Volume X ("Volume X," Dkt. No. 162);
  - o Volume XI ("Volume XI," Dkt. No. 164);
  - o Volume XII ("Volume XII," Dkt. No. 163);
- Declaration of Christina N. Goodrich with attached exhibits ("Goodrich Decl.," Dkt. No. 143);
- Declaration of Rachel Berman with attached exhibits ("Berman Decl.," Dkt. No. 147); and
- Applications to Seal Documents (Dkt. Nos. 138, 141, 148-153, 168-169).

On July 22, 2024, Defendants filed a reply in support of the Motion. ("Reply," Dkt. No. 177.) In support, Defendants filed the following documents:

- Defendants' Response to the SUF Opposition ("SUF Reply," Dkt. No. 177-4);
- Defendants' Response to the Plaintiff's AMF ("AMF Reply," Dkt. No. 177-4);
- Declaration of Lara Esposito ("Esposito Decl.," Dkt. No. 177-1);
- Declaration of Cameron Sousa ("Sousa Decl.," Dkt. No. 177-2);
- Supplemental Declaration of Jonathan Yank ("Supplemental Yank Decl.," Dkt. Nos. 177-3, 188-189);
- Notice of Errata for the Supplemental Yank Decl. (Dkt. No. 187); and
- Evidentiary Objections to the Opposition ("Opposition Evidentiary Objections," Dkt. No. 177-5).

## II.   EVIDENTIARY ISSUES

### A. Evidentiary Objections

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002); see Fed. R. Civ. Proc. 56(e). At the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial. See, e.g., Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003). The Court considers the parties' objections only where necessary.[1] All other objections are **OVERRULED AS MOOT**.

---

[1] "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here.

### B. Applications to Seal

Both parties have filed applications to file documents provisionally under seal. (Dkt. Nos. 126, 138, 141, 148-153, 168-169, 183 (collectively, "Applications").)

There is a strong presumption against filing documents under seal. See Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172, 1178 (9th Cir. 2006). Generally, two standards govern requests to seal documents: the "compelling reasons" standard and the "good cause" standard. Pintos v. Pac. Creditors Ass'n, 605 F.3d 665, 667 (9th Cir. 2010). The "good cause" standard is an "exception" to the "presumptive 'compelling reasons' standard" and only applies to "sealed materials attached to a discovery motion unrelated to the merits of a case." Ctr. for Auto Safety v. Chrysler Grp., LLC, 809 F.3d 1092, 1097 (9th Cir. 2016). For all other cases, a party seeking to seal a judicial record bears the burden of presenting "compelling reasons." Kamakana, 447 F.3d at 1178-79. "[T]he party must 'articulate[] compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the 'public interest in understanding the judicial process.'" Id. Compelling reasons exist when "court files might have become a vehicle for improper purposes, such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig., 686 F.3d 1115, 1120 (9th Cir. 2012) (citation and quotation omitted).

The parties seek to file the documents at issue under seal because Axos has designated them as "confidential" or "highly confidential." (See Applications.) However, "the presumption of access is not rebutted where ... documents subject to a protective order are filed under seal as attachments to a dispositive motion." Foltz, 331 F.3d at 1136 (internal citations omitted); see also L.R. 79-5.2.2(a)(i) ("That the information may have been designated confidential pursuant to a protective order is not sufficient justification for filing under seal; a person seeking to file such documents under seal must comply with [the Local Rules].").

The parties represent that the information to be sealed includes confidential, competitively sensitive information (including trade secrets), the disclosure of which will cause one or more party substantial economic and business harm. (Dkt. No. 168.) Sensitive commercial information and information that might promote public scandal can be compelling reasons to permit the filing of a document under seal. Table de France, Inc. v. DBC Corp., 2019 WL 6894521, at *2 (C.D. Cal. Oct. 18, 2019). Even so, the parties request to seal or redact nearly every document submitted for the Motion and Opposition without significant explanation. Erring on the side of caution, the Court **GRANTS** the Applications. However, the Court

---

Burch v. Regents of Univ. of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.") At the summary judgment stage, the Court focuses on the admissibility of the evidence's contents, not the admissibility of the evidence's form. Fed. Deposit Ins. Corp. v. N.H. Ins. Co., 953 F.2d 478, 485 (9th Cir. 1991) ("[T]he nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

reminds the parties that they bear the burden of showing compelling reasons to justify sealing the record from the public.

### III.  FACTS

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted. They are "admitted to exist without controversy" for purposes of the Motion. See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

**A. Parties**

Plaintiff Axos Bank is a federally chartered savings bank headquartered in San Diego, California. (Yank Decl., Ex. 2 at 6.) Defendant Nano Banc was founded in 2018 after completion of a merger with Commerce Bank of Temecula Valley, it has branches in Irvine, Murrieta and Los Angeles, California. (SUF ¶ 1.) Defendant Troncale is one of the founders of Nano. (Id. ¶ 2.) On or about September 5, 2012, Defendant Hasler began working at Axos in the Specialty Deposits Division where he primarily worked with 1031 exchanges and escrow companies. (Id. ¶¶ 4-5.) When Hasler came to Axos, he brought with him many of his existing customers—no less than 24 customers followed Hasler to Axos. (Id. ¶ 6.) After nearly 6 years at Axos, Hasler resigned on or about July 2, 2018.[2] (Id. ¶ 7.) When Hasler left Axos, some of these customers followed him to Nano. (Id. ¶ 8.)

Defendant Martello was employed by Axos from July 12, 2012 to November 9, 2012, and again from December 1, 2014 to March 28, 2018—Martello worked in the Specialty Deposits Division with Hasler where she was a part of the Business Banking Department. (Id. ¶¶ 15-16.) On March 28, 2018, Martello was terminated by Axos. (Id. ¶ 17.) Troncale put Martello in contact with Commerce Bank of Temecula Valley's ("CBTV") CEO, Scott Andrews. (Id. ¶ 19.) On or about April 16, 2018, Martello was hired by CBTV. (Id. ¶ 19.) CBTV was later acquired by Nano. (Id. ¶ 1.)

**B. Alleged Trade Secrets**

In the SAC, Plaintiff alleges the following categories of trade secrets: "computer code and programs, product design definitions and specifications, product development agreements, term sheets and other related agreements, financial projections, marketing plans and marketing data and methodologies, sales data, unpublished promotional material, cost and pricing information, customer information (lists and preferences), pending patent applications, business know-how, processes (including process diagrams and flow charts), distribution sources, personnel

---

[2] Plaintiff disputes this contention based on evidence that Hasler was in contact with Troncale since at least February 2017. (SUF Opposition ¶ 7.) In fact, many of Plaintiff's responses to the SUF pertain to evidence of an alleged conspiracy. (See, e.g., SUF Opposition ¶¶ 7-8, 17.) Unless otherwise noted below, the Court finds that this evidence does not contradict the proffered facts. As such, the Court deems proffered facts that rely on similar evidence, without more, as undisputed.

information including but not limited to pay plans and bonus structures, commercial books of business, marketing materials, strategic financial information, forecasts, strategic business and financial plans, and client lists with specialized information regarding current, former, and prospective clients uncovered through the work of employees of AXOS (such as custom pricing, fee waivers, information about key decision makers, information about important service providers, client preferences, client's personal information, and know-how)." ("TS Categories," SAC ¶ 59; Park Decl. ¶ 12; see SUF ¶ 21.)  "These categories broadly encompass specific documents and types of information that fall within Axos's Trade Secrets (and certain documents may fall within multiple categories, as they are Trade Secrets for multiple reasons)." (Park Decl. ¶ 11.)

Park oversees the Specialty Deposits Division and was designated as Axos's corporate representative on this topic.  (Park Decl. ¶ 11.)  In his declaration, he defines twenty trade secrets categories and outlines the extensive record of specific documents, information, and testimony that make up these trade secrets.  ("Axos's Trade Secrets," Park Decl. ¶¶ 12-14, 37-68.)  Axos's Trade Secrets include, but are not limited to the following:

- Axos's Weekly Sales Report and Large Deals Pipeline (Park Decl. ¶¶ 35, 54, Exs. L-S; Timm Decl. ¶ 25, Exs. 18-20; AMF ¶ 33);
- Hasler's Complete Axos Portfolio (Timm Decl. ¶ 115, Ex. 114, ¶ 57, Ex. 55; id. ¶ 116, Ex. 115 at 74:10-75:4, 75:8-23, 77:25-78:25, 79:21-80:23, 82:1-6, 228:12-14; Park Decl. Ex. I (AXOS_00000821-824), J (AXOS_0002544);
- Axos's Marketing Rates and data (SUF Opposition ¶ 35-36);
- Axos's Account Analysis Spreadsheets (SUF Opposition ¶ 34-36);
- Axos's Specialty Deposits Exceptions Spreadsheet (SUF Opposition ¶ 34);
- Uninsured Deposit Spreadsheet (SUF Opposition ¶ 34-36);
- Axos's customer deposit spreadsheets (SUF Opposition ¶ 34-36); and
- Customer-specific information, including rate, pricing, name, history, transactions (Park Decl. ¶¶ 9, 12, 35, 39, 41-43, 49-50, 57, Ex. A-H (spreadsheets), I-K (book of business summaries/reports), L-S (weekly sales reports and large deal pipelines), T-CC (customer compilation marketing rates), DD-EE (account analysis spreadsheets), FF-GG (specialty deposits exceptions spreadsheets), HH-II (uninsured deposit spreadsheets), JJ (compilation of customer data), KK-UU (transaction history), VV (QEA agreement), WW (commercial lending underwriting guidelines), XX (cash management services agreements); Timm Decl. Ex. 22 (customer specific deposit information); Simpson Decl. ¶¶ 15-17, Exs. B-J (obligation to maintain confidentiality and work product while working at Axos is Axos's property); Timm Decl. Ex. 9, 15, 23-28 (marketing materials), Ex. 32 (internal bank processes); Ex. 35, 71, 108 (Axos's internal forms); Ex. 55 (portfolio of Axos's customer information); Ex. 70, 74 (process documents and checklists);[3] Ex. 100, 141 (customer-specific details, including history, balances,

---

[3] The parties dispute whether Axos's checklists were misappropriated by Nano. (SUF Reply ¶ 26.)

account rate, MF rate, interest paid, total case, WAR, preferences); see AMF ¶¶ 1-57 (citing additional specific evidence showing trade secrets and related testimony)).

(SUF Opposition ¶ 21; see AMF ¶¶ 6-28.)[4]

Axos has spent years investing substantial resources in developing the expertise and resources needed to effectively and competitively service this industry, which included developing Axos's Trade Secrets. (AMF ¶ 3.) Since 2012, Axos invested a significant amount of money into developing Specialty Deposits Division, including personnel cost, outside service costs, IT service costs, and various other developmental costs. (Id. ¶ 4.) As a condition of employment, Axos requires employees to execute an Employee Confidentiality, Non-Disclosure, and Non-Recruiting Agreement, under which employees agree to not use, publish, or disclose Axos's confidential and proprietary information, including Axos's trade secrets, during and after their employment with Axos, except as required in conducting Axos's business or as authorized in writing by Axos—Hasler and Martello executed these agreements with Axos. (Id. ¶¶ 30-32.) As conditions of their employment, Hasler and Martello also signed confidentiality agreements between themselves (individually) and Axos. (Id. ¶¶ 37-38.) Axos does not provide its customers with its trade secrets.[5] (Id. ¶ 44.)[6] While Axos's clients may be granted certain information pertaining to their own accounts, they are only given access to a customer-facing system that allows them to view only their own customer information, which is different from the systems used by Axos employees (including Hasler and Martello) to service Axos's clients. (Id. ¶ 45.)

Axos maintains as confidential its compilations of customer information (or portions thereof) that is housed in its internal systems, which contains customer information such as customer name, contact information, pricing, product mix, banking history, customer preferences, client-specific terms, and other key facts.[7] (Id. ¶ 47.) Axos maintains as confidential

---

[4] Defendants dispute Plaintiff's SUF Opposition on the grounds that Plaintiff's evidence "contradicts" its SAC, response to interrogatory 1 (see Yank Decl., Ex. 2), and the testimony of David Park. (SUF Reply ¶¶ 21-26.) However, Defendants do not explain how or why a contradiction exists and it is not clear to the Court that this is true. Accordingly, the Court rejects this argument.

[5] Defendants only dispute this proffered fact to the extent that the information which Axos claims to be trade secrets includes information which is publicly available, such as 1031 exchange companies and escrow companies. (AMF Opposition ¶ 44.) However, Defendants do not dispute the fact that Axos does not provide its clients with Axos's Trade Secrets. (See id.) As such, the Court deems "Axos does not provide its clients with Axos's Trade Secrets" to be an undisputed fact.

[6] Beginning with AMF Opposition ¶ 43, Defendants' numbering is incorrect because Plaintiff skipped AMF ¶ 43. For clarity, the Court follows the numbers in the original AMF.

[7] While Defendants label this fact as disputed, the Court disagrees. (AMF Opposition ¶ 47.) Defendants' argument that the "items listed by Plaintiff are broad categories of materials" that "do not meet the definition of a protectable trade secret" is a legal question for the Court to

its compilations of prospective client information (or portions therof) that are housed in its internal systems, which contains customer information such as customer name, contact information, pricing, type of product interested in, requested client-specific terms, history of contact with prospect, customer preferences, and other key facts (sometimes referred to as pipeline or forecast information). (Id. ¶ 48.) Nano, like any competing bank, does not have access to Axos's compilations of current and prospective customer data that it uses to service its clients and go after new clients. (Id. ¶ 50.) For each client relationship, multiple employees are involved in developing and managing the relationship and the information obtained during that process has value given the substantial time and effort spent to acquire this information and keep it confidential so as to maintain a competitive advantage based on those efforts. (Id. ¶ 52.) Defendants exfiltrated Axos's data by email, printouts, and otherwise, then gave it to Nano, and used it to divert Axos's customers to Nano. (Id. ¶ 56.) Axos's damages from Defendants' conduct includes the lost profits from at least 15 customers. (Id. ¶ 58.) The parties dispute what fees were charged to Nano customers and whether Nano had a "zero fee model." (SUF ¶ 68.)

## IV.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

"When the moving party also bears the burden of persuasion at trial, to prevail on summary judgment it must show that 'the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" Shakur v. Schriro, 514 F.3d 878, 890 (9th Cir. 2008). This is "ordinarily a heavy burden." Barnes v. Sea Haw. Rafting, LLC, 889 F.3d 517, 537 (9th Cir. 2018). By contrast, where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Celotex, 477 U.S. at 325. Instead, the moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." Id. However, if the moving party has sustained its burden, the non-moving party must show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. The non-moving party must make an affirmative showing on all

---

decide and does not constitute a valid factual dispute. Accordingly, the Court deems this and all future baseless "disputes" as undisputed. (See, e.g., AMF Opposition ¶¶ 48, 56-57.)

matters placed at issue by the motion as to which it has the burden of proof at trial. Id. at 322; Anderson, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. "The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Anderson, 477 U.S. at 252).

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991). Summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

## V.   DISCUSSION

Defendants move for summary judgment on Plaintiff's seven claims: (1) misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq.; (2) intentional interference with contractual relations; (3) intentional interference with prospective economic advantage; (4) negligent interference with prospective economic advantage; (5) breach of contract (as to Hasler); (6) violation of UCL; and (7) breach of contract (as to Martello). (See Motion.) Defendants argue that Plaintiff cannot establish trade secret misappropriation as a matter of law, and that they are entitled to summary judgment as to the remaining claims "because they are contingent on the trade secret claim" and because of Plaintiff's limited expert admission. (Id. at 4-5.)

**A. Trade Secrets Claim: DTSA (Count One)**

Defendants move for summary adjudication on Plaintiff's trade secret claim under the DTSA. (See id.) Defendants argue that: (1) Plaintiff fails to identify trade secrets with the requisite specificity, (2) the alleged trade secrets are not protectable, (3) Plaintiff fails to show misappropriation and at times concedes there was no misappropriation, and (4) Plaintiff fails to prove damages. (Motion at 11-26.)

Congress enacted the DTSA to "provide Federal jurisdiction for the theft of trade secrets." See DTSA of 2016, Pub. L. No. 114-153, 130 Stat. 376 (codified in several sections of title 18 to the United States Code). The DTSA permits the "owner of a trade secret that is misappropriated" to bring a civil action, 18 U.S.C. § 1836(b), and includes substantially similar definitions of "trade secret" and "misappropriation." See 18 U.S.C. § 1839(3), (5).

//
//

1. **Trade Secrets**

    Defendants first argue that Axos fails to identify the claimed trade secrets with reasonable particularity or to show that the trade secrets are protectable. (Motion at 13-14.)

    The DTSA defines "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). This definition "is broad." InteliClear, LLC, 979 F.3d at 657.

    "A plaintiff seeking relief for misappropriation of trade secrets 'must identify the trade secrets and carry the burden of showing that they exist.'" Imax Corp. v. Cinema Tech., Inc., 152 F.3d 1161, 1164 (9th Cir. 1998) (quoting MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 522 (9th Cir. 1992)). "The plaintiff should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in a trade or of special knowledge of those persons skilled in trade." Id. at 1164–65 (internal citations and alterations omitted). The description should "permit the defendant to ascertain at least the boundaries within which the secret lies.'" Bunnell v. Motion Picture Ass'n of Am., 567 F. Supp. 2d 1148, 1155 (C.D. Cal. 2007) (quoting Diodes, Inc. v. Franzen, 260 Cal. App. 2d 244, 253 (1968)).

    Here, Axos identifies defines twenty trade secrets categories and outlines the extensive record of specific documents, information, and testimony that make up these trade secrets. (Opposition at 6-10, 21-23; see Axos's Trade Secrets.) Defendants fail to acknowledge, much less respond to this list and instead argue that Axos "gives only generalized conclusory statements without substantive evidence." (Reply at 14.) The Court disagrees.

    Axos's list of trade secrets includes: weekly sales reports, large deal pipeline reports, marketing rates and data, account analysis spreadsheets, specialty deposits exceptions spreadsheets, uninsured deposit spreadsheets, customer deposit spreadsheets, customer-specific information including rate, pricing, name, history, and transactions. (See Axos's Trade Secrets.) Unlike the identified trade secrets in Defendants' cited authority, the list and accompanying evidence does not include "matters of general knowledge or common practice." Chung v. Intellectsoft Group Corporation, 2024 WL 813445, at *7 (N.D. Cal. Feb. 12, 2024). Nor do the identified secrets use vague terminology. See, e.g., Freeman Inv. Mgmt. Co. v. Frank Russell Co., 2016 WL 5719819, at * 11 (S.D. Cal. Sept. 30, 2016) (finding trade secret described as "emphasizing volatility" not particular).

Defendants point to the SAC, where Axos pleads the trade secrets as twenty general categories. (SUF ¶ 21; SAC ¶ 59.) Understandably, this list represents the alleged trade secrets at the highest level of generality and "do[es] not constitute the whole of Axos's Trade Secrets." (SUF Opposition ¶ 21.) In its Opposition, Axos produced a compendium of evidence including five detailed declarations and twelve volumes of exhibits which include thousands of pages of particular information. (See Simpson Decl.; Park Decl.; Goodrich Decl.; Berman Decl.; Timm Decl.; Volumes I-XII.) For example, in his 43-page declaration—filed under seal to protect Axos's proprietary information—Park expands on each category and provides specific details and documents claimed as trade secrets. See InteliClear, LLC v. ETC Global Holdings, Inc., 978 F.3d 653, at 658-59 (9th Cir. 2020) (holding that plaintiff identified alleged trade secrets with enough specificity to create a triable issue of fact). Axos's burden is only to identify at least one trade secret with sufficient particularity to create a triable issue. Id. (citing Freeman Inv. Mgmt. Co. v. Frank Russell Co., 2016 WL 5719819, at *11 (S.D. Cal. Sept. 30, 2016) (noting that "it's not the volume, it's the particularity that matters")).

As Axos asserts, each trade secret includes a description that seems tailored to specific documents. (Opposition at 6-10.) Many descriptions seem to name existing documents and identify narrow topics as opposed to a catch-all category. See SMS Signature Cars v. Connect Mktg. LLC, 2013 WL 12138992, at *3 (C.D. Cal. May 15, 2013) (finding "pricing process" for plaintiff's product identified with sufficient particularity when described as "'the amount that could be spent on the design and building process … as shown by SMS's research' and the 'specific changes (and their accompanying price levels) that should be made to the vehicle and engine to achieve maximum performance and marketability while staying within SMS's required price structure"). The Court finds that Axos has "sufficiently 'described the subject matter of the trade secret with sufficient particularity.'" Brocade Commc'n Sys., Inc. v. A10 Networks, Inc., 873 F. Supp. 2d 1192, 1215 (N.D. Cal. 2012) (quoting Whyte v. Schlage Lock Co., 101 Cal. App. 4th 1443, 1453 (2002)).

The Court next considers whether the claimed trade secrets warrant protection under the DTSA. Defendants do not contest that the identified information, categorically, falls within the definition of "trade secret."[8] Rather, Defendants argue that Axos fails to show that it took reasonable efforts to keep the information secret, as some of the information necessarily may be shared or is "generally known in the industry." (Motion at 15-16.) Defendants also argue that none of the contracts Axos asked their customers to execute included a confidentiality or non-

---

[8] Courts routinely find that "[t]his type of information is routinely given trade secret protection." Brocade Commc'ns Sys., Inc., 873 F. Supp. 2d at 1214 (discussing "confidential customer-related information including customer lists and contact information, pricing guidelines, historical purchasing information, and customers' business needs/preferences"); see also Albert's Organics, Inc. v. Holzman, 445 F. Supp. 3d 463, 472 (N.D. Cal. 2020) ("Courts have frequently held that customer-related information qualifies as a trade secret…."); Mattel, Inc. v. MGA Entm't, Inc., 782 F. Supp. 2d 911, 972 (C.D. Cal. 2011) ("Information about customers' preferences can aid in 'securing and retaining their business.'").

disclosure provision that would have precluded them from disclosing the terms of their business relationship with Axos.  (Id. at 19.)

In response, Axos submits evidence that it enforced confidentiality policies with its employees.  (Opposition at 23-25; Simpson Decl., Exs. B-I.)  Courts have found that such actions constitute reasonable measures to keep information secret.  See Maharis v. Omaha Vaccine Co., 967 F.2d 588 (9th Cir. 1992) (requiring signing of non-disclosure agreements and oral agreements to keep information secret sufficient); Whyte, 101 Cal. App. 4th at 1454 (recognizing that "advising employees of the existence of a trade secret" as a reasonable effort to maintain secrecy).  Axos also offers evidence to show that it made efforts to keep even information that could be shared or found in public confidential.  (SUF Opposition ¶¶ 30, 48.)  Courts have recognized that a trade secret does not lose its secret character merely because information related to the claimed secret is "public knowledge."  Brocade Commc'ns Sys., Inc., 873 F. Supp. 2d at 1215.  (finding that plaintiff had greater justification for seeking to protect "additional information linking each customer to other confidential information" when "the customer names [were] public knowledge").

Moreover, even public information qualifies as a trade secret "if a plaintiff has spent 'considerable time, effort, and resources' in developing some of that information."  Albert's Organics, Inc. v. Horizon, 445 F. Supp. 3d 463, 472 (N.D. Cal. 2020) (internal citations omitted); see also Pyro Spectaculars N., Inc. v. Souza, 861 F. Supp. 2d 1079, 1089 (E.D. Cal. 2012) (finding that even if "many of the individual pieces of information in the Booking Forms program can be ultimately ascertained by requesting and scouring public records, calling customers and operators, and reverse engineering videos and CS," this "misses the point" because the purpose of the "Booking Forms program" was to "provide a virtual encyclopedia" of information "at a competitor's fingertips" so that a competitor did not have "to expend the effort to compile the data"); c.f. In re Sotera Wireless, Inc., 794 F. App'x 625, 627 (9th Cir. 2020) (noting that lower court did not find "a meaningful distinction" between the alleged trade secret of "customized alarm analytics" and "analyzing aggregate hospital data as a sales technique").  A reasonable jury may infer from the evidence that Axos spent time and resources developing "highly-valuable" confidential customer data reports, sales reports, and marketing strategies, such that the resulting information was a trade secret.  (See Opposition at 4-9, 21.)  Accordingly, the Court concludes that Axos raises a genuine issue of material fact on whether Axos has identified trade secrets under the DTSA.

2.  **Misappropriation**

Defendants next argue that Axos fails to show that Defendants misappropriated any claimed trade secrets.  (Motion at 23-26.)  Under the DTSA, misappropriation occurs when a defendant "acquired, disclosed, or used the plaintiff's trade secret through improper means." Sargent Fletcher, Inc. v. Able Corp., 110 Cal. App. 4th 1658, 1665 (2003); see 18 U.S.C. § 1839(5)(A)-(B)(i) (defining "misappropriation" as "acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means; or disclosure or use of a trade secret of another without express or implied consent by a person who—used

improper means to acquire knowledge of the trade secret"). "'Improper means' is defined as 'theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.'" Brocade Commc'ns Sys., Inc., 873 F. Supp. 2d at 1212 (quoting Cal. Civ. Code § 3426.1(a)); 18 U.S.C. § 1839(6) (defining "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means"). The plaintiff bears the burden of proving misappropriation "by circumstantial as well as direct evidence." Id.

Defendants' only substantive argument as to misappropriation is that Axos conceded that categories 11, 13, 15, and 16 were not misappropriated. (Motion at 25-26.) Defendants point to Park's deposition testimony where he "testified that he had no information that anything was misappropriated." (Motion at 25; SUF ¶¶ 58-66.) However, Axos submits countervailing evidence that Hasler and Martello, while still working at Axos, exfiltrated Axos's confidential pipeline reports, valuable customer data, book of business and portfolio data, among other things, to Defendants. (Opposition at 13-18; SUF Opposition ¶¶ 24, 26, 38-43, 51, 54, 60; AMF ¶¶ 56-57.) Axos produces additional evidence that Hasler and Martello related confidential information to Nano, including contracts, business opportunities, and customers, before they terminated employment with Axos and began employment with Nano. (Opposition at 13-18; SUF Opposition ¶¶ 24, 26, 38-43, 51, 54, 60; AMF ¶¶ 56-57.) While "mere possession of information is not enough to establish improper acquisition of a trade secret," it is still relevant. Hooked Media Grp., Inc. v. Apple Inc., 55 Cal. App. 5th 323, 333 (2020). Axos's evidence creates a genuine dispute as to whether Defendants acquired, disclosed or used Axos's trade secrets through improper means. A reasonable jury, drawing all inferences in Axos's favor, may conclude that Defendants misappropriated Axos's trade secrets.

### B. Other claims

Defendants contend that even if Axos survives summary judgment by establishing evidence of trade secrets and misappropriation, Axos's remaining claims fail because it offers no admissible damages evidence. (Motion at 26.) Defendants contend that Axos's damages expert, Dr. Michael Cragg ("Dr. Cragg") "testified unequivocally that he would not opine on categories of damages other than the attributed loss based on deposits of 15 identified customers leaving Axos." (Motion at 26.) Axos contends that Defendants' conclusion does not follow from its premise because Axos's loss of 15 customers relates to all of Axos's claims and Dr. Cragg's report and deposition testimony estimates damages based on all of Defendants' acts. (Opposition at 28; AMF ¶¶ 57-78; SUF ¶¶ 70-72.) As such, the Court finds that Axos raises a genuine dispute on whether Axos suffered damages as to all claims.

Accordingly, because Defendants fail to meet its summary judgment burden on all of Axos's claims, the Court **DENIES** the Motion as to all claims.

//
//
//

## VI. CONCLUSION

For the foregoing reasons, the Court **DENIES** the Motion. The September 9, 2024 hearing is **VACATED**. The Court **DIRECTS** the parties to meet and confer and file a joint stipulation with new proposed pretrial conference and trial dates for the Court's consideration no later than **September 16, 2024**.[9]

**IT IS SO ORDERED.**

---

[9] Plaintiff filed a motion in limine to exclude the opinions, testimony, and report of Defendants' expert Raymond Clark. ("P-MIL," Dkt. Nos. 144, 146-1.) Defendants filed a motion in limine to exclude Plaintiff's designated expert Michael Cragg. ("D-MIL," Dkt. Nos. 193, 194.) Collectively, the Court refers to the P-MIL and D-MIL as the "MILs". The MILs are currently noticed for hearing on September 9, 2024, at 9 a.m. The Court **VACATES** the MILs hearing dates—the Court will hear argument concerning the MILs on the new pretrial conference date.